**Otis HILLIARD, Plaintiff,**

v.

**Charles SCULLY, Harold J. Smith, John B. Wong, Defendants.**

No. 81 Civ. 5457 (JES).

United States District Court, S.D. New York.

Dec. 4, 1986.

Otis Hilliard, pro se.

Robert Abrams, Atty. Gen. of N.Y., New York City, for defendants; Joyce Andren, Asst. Atty. Gen., of counsel.

## OPINION AND ORDER

SPRIZZO, District Judge:

 Plaintiff *pro se*[1] brings this action pursuant to 42 U.S.C. § 1983 seeking declaratory and injunctive relief as well as money damages against the following defendants: Charles Scully, Superintendent of Green Haven Correctional Facility ("Green Haven"); Harold J. Smith, Superintendent of Attica Correctional Facility ("Attica"); Officer R. Dore, a corrections officer at Green Haven;[2] and John B. Wong, the former Correctional Rehabilitation Program Coordinator at Green Haven.

The Court has previously issued an Opinion and Order in this action denying plaintiff's motions for summary judgment, leave to file a supplemental complaint, and jury trial, and denying defendants' cross-motion for summary judgment. *See Hilliard v. Scully,* 537 F.Supp. 1084 (S.D.N.Y.1982); *see also Hilliard v. Scully,* slip op. (S.D. N.Y. Oct. 29, 1982) (denying plaintiff's subsequent motion for leave to file a supplemental complaint.)[3] The Court has held a

1. At the start of the trial, the plaintiff requested an adjournment, claiming that he believed he was brought to Court from prison only for a Pre-Trial Conference. *See* Tr. at 1–13. The plaintiff requested the adjournment because he stated that he needed an attorney. *See id.* at 1. No prior motion for appointment of counsel was ever filed by the plaintiff with the Court. After the Court indicated its unwillingness to grant this belated request, plaintiff then requested an adjournment on the grounds that he already had counsel who had not appeared. *See id.*

At the outset, the Court finds plaintiff's assertion that he thought the Court was only holding a Pre-Trial Conference to be incredible. Two months prior to trial, the Court issued an Order placing the above-captioned action on the Court's ready trial calendar. At trial, plaintiff implicitly acknowledged receiving this scheduling order. Thus, the plaintiff corrected a misstatement by the defense counsel with respect to the ready trial date, a date which plaintiff would not have been aware of unless he received the scheduling order. *See id.* at 10. Moreover, defense counsel stated at trial that, at their last meeting, she handed to plaintiff a copy of the order and she specifically informed plaintiff that the next time he came to Court, it would be for trial. *See id.* at 11.

Given the clear notice to plaintiff that the trial would be held, the preparations by the Court and the defense counsel in anticipation of that trial, and taking into account the expense incurred in bringing the plaintiff to Court from prison, the Court denied plaintiff's last minute request for an adjournment. The Court did, however, inform plaintiff that if he had other evidence which he desired to offer at a later date, the Court would afford him the opportunity to do so. *See id.* at 11–12. Plaintiff has never sought leave to present further evidence to the Court.

Clearly, plaintiff's belated request for appointment of counsel was not a sufficient justification to adjourn the trial. Plaintiff had ample opportunity to move for the appointment of counsel prior to trial. More importantly, in light of the complete lack of even colorable merit to plaintiff's claim, this was not a case where the appointment of counsel would have

been warranted in any event. Although prior to trial, it was not entirely clear, as it is now, that plaintiff's claims were frivolous, at best it appeared that plaintiff's chances for success were slim. This did not justify the appointment of counsel. *See Hodge v. Police Officers,* 802 F.2d 58, 60 (2d Cir.1986).

Moreover, this was not a case where assistance of counsel was necessary either to conduct a factual investigation or effectively cross-examine the defendants' witnesses at trial. *Compare id.* at 61. Thus, the basic facts in this case, *i.e.,* that plaintiff was placed in a Special Housing Unit without a finding that he was guilty of any violation of prison rules, that he was denied the right to cross-examine witnesses at the Superintendent's hearing, and that he was transferred to another prison prior to the hearing on his Article 78 proceeding, were undisputed. *See* Tr. at 156. In addition, as the Court noted at the conclusion of trial, plaintiff ably presented his case to the Court. *See id.* at 153.

The Court also notes that plaintiff's incredible and obviously inconsistent request for an adjournment on the ground that he already had counsel was frivolous. No notice of appearance by an attorney for the plaintiff has ever been filed in this action.

2. The record is unclear as to whether Officer Dore was ever served in this action. *See Hilliard v. Scully,* 537 F.Supp. 1084, 1085 n. 2.

3. In seeking leave to supplement his complaint, plaintiff sought to add allegations against prison officials at Great Meadow. The Court denied leave to supplement the complaint in part because venue was improper for those claims. *See Hilliard, supra,* 537 F.Supp. at 1090 & n. 22. At trial, plaintiff once again sought to raise these allegations, as well as allegations of misconduct by prison officials at Attica not contained in plaintiff's complaint. While the Court informed the plaintiff that the Court would not rule on the merits of those claims due to improper venue, *see* Tr. at 17–19, the Court allowed the plaintiff to fully present any evidence he had with respect to those allegations because that evidence may have been relevant to the claims properly before the Court. *See id.*

bench trial in this action and has received post-trial memoranda from the parties. The following constitutes the Court's findings of facts and conclusions of law pursuant to Fed.R.Civ.P. 52.

## BACKGROUND

On February 1, 1981 there was a fire in the cell of an inmate named Flowers, who was then incarcerated at Green Haven. On the same day, corrections officer Dore filled out an "Inmate Misbehavior Report" against the plaintiff. *See* Def.Ex. A–3. According to the report, the plaintiff and another inmate, Thompson, were suspected of arson in connection with the fire in Flower's cell. The plaintiff was given the report on February 1, and placed in a special housing unit ("SHU")[4] pending an investigation of the charges. *See id.;* Trial Transcript ("Tr.") at 13–14.

On February 2, 1981, plaintiff appeared before the adjustment committee.[5] *See* Tr. at 15. Although plaintiff denied the charges at the adjustment committee interview, the adjustment committee, after reviewing the available evidence, recommended that a superintendent's hearing be held. *See* Def.Ex. A–4. Plaintiff was informed of the adjustment committee's disposition and plaintiff remained in the SHU.

A formal charge[6] was then prepared by corrections officer Egger on February 4, 1981 and Sergeant Holt served the plaintiff with the charge on the next day. *See* Def.Ex. A–6; Tr. 44, 110. The charge read as follows:

INVOLUNTARY PROTECTION STATUS

On February 1, 1981 at approximately 7:50 a.m. a fire was deliberately set in cell B–1–112 which belongs to inmate Flowers 76A–2565. From information received through investigation and from a confidential source you have been identified as one of the inmates responsible for this fire. Further information indicates that you have also been involved in an extortion ring within the facility.

Based on the above the administration has recommended that you be placed in involuntary protection status for the safety and security of the facility.

*See* Def.Ex. A–6.

When Sergeant Holt served the formal charge, he asked plaintiff if he needed investigatory assistance in his defense of the charge.[7] *See* Tr. at 111. Plaintiff indicated that he wanted corrections counselor Stanulwich to assist him. *See id.* The next day, on February 6, Stanulwich went to the SHU and interviewed the plaintiff. During the interview, however, the plaintiff claimed that he did not need any assistance and that he did not want Stanulwich to interview any witnesses. *See* Tr. at 116.

The defendant Wong conducted plaintiff's first superintendent's hearing on February 11, 1981. *See* Tr. 15, 125. At that hearing, the plaintiff again denied that he was involved in the fire and requested that

---

**4.** A special housing unit is defined by regulation as a group of cells "for confinement of inmates who are not in a program that permits them to commingle with the general inmate population." *See* 7 NYCRR § 300.2(b). Inmates may be placed in an SHU for a variety of reasons. The relevant classifications are: (a) protective admission, which applies when inmates are potential victims or must, for good cause, be restricted from the general inmate population, *see* 7 NYCRR § 304.1(b); (b) adjustment admission, which applies when an inmate is confined pending the disposition of an adjustment committee or superintendent's proceeding, *see* 7 NYCRR § 304.1(d); or (c) disciplinary confinement, *see* 7 NYCRR § 253.5(4).

All regulations set forth in this Opinion and Order correspond to the New York regulations in existence during the relevant time periods in this action.

**5.** The function of the adjustment committee is *inter alia* "to ascertain the full and complete facts and circumstances of the incidents of inmate misbehavior alleged in reports to the superintendent" and "to ascertain the underlying causes of such incident." *See* 7 NYCRR § 252.-2(a)(b).

**6.** *See* 7 NYCRR § 253.2.

**7.** 7 NYCRR § 253.3 provides in relevant part that the "person appointed to conduct the [superintendent's] hearing shall designate an employee to furnish assistance to the inmate. This assistance shall be solely of an investigatory nature."

Wong interview an inmate named Carlos Dade. *See* Tr. at 125. Wong then adjourned the hearing so that he could conduct the requested interview. In addition to interviewing Dade, Wong also interviewed the following people: Officer Dore, who was in the prison area when the fire started; Sergeant Cheers, the sergeant in charge of evacuating the prisoners during the fire; Flowers, whose cell was set on fire; and an inmate named Thomas, who was implicated along with the plaintiff as being involved in the alleged arson and the extortion ring. *See* Tr. at 124–26; Def.Ex. A–8.

Wong testified at trial that, as a result of his investigation, he believed the fire in Flower's cell was caused by arson. *See* Tr. at 125, 150–51. Wong testified that, while neither Sergeant Cheers nor Officer Dore claimed to have any personal knowledge with respect to who set the fire, both officers told Wong that other inmates had accused Thomas and the plaintiff of the arson. *See id.* at 128, 139. Moreover, Wong testified that his investigation revealed that the three inmates, the plaintiff, Thomas, and Flowers, were involved in a physical altercation a couple of days prior to the fire. *See id.* at 126.

Following his investigation of the fire, Wong held a second superintendent's proceeding on February 13, 1981. *See id.* at 125. At the hearing, Wong refused to divulge to the plaintiff the name of the inmates who accused him of arson, *see id.* at 134–35, nor would he allow the plaintiff to hear the testimony of Carlos Dade. *See id.* at 137–38. According to Wong, when dealing with inmates within the same prison population, the danger of later violent repercusions between the inmates is too great to allow an accused inmate the opportunity of hearing or cross-examining the testimony of an accusing inmate. *See id.* at 138.

It is significant to note that Wong testified that he never considered these proceedings to be formal disciplinary proceedings against the plaintiff. Instead, Wong testified that the investigations and the hearings were simply designed to ensure that security and peace would be maintained throughout the prison. *See id.* at 139–40. Thus, the only issue Wong claims he set out to resolve at that time, was whether the plaintiff should be segregated from the general prison population and transferred to another institution for security purposes. *See id.* Wong's testimony is corroborated by the formal charge issued against the plaintiff as well as the Superintendent's worksheet, which both indicate that the charge in this case was not disciplinary but merely a charge seeking to place the plaintiff in involuntary protection status. *See* Def.Ex. A–6, A–8. According to Wong, if the evidence had warranted disciplinary sanctions, a formal disciplinary charge would have issued at a later date. *See* Tr. at 140.

At the conclusion of the second superintendent's hearing, on February 13, Wong concluded that the plaintiff, as well as Thomas and Flowers, who had separate hearings, should remain in involuntary protection status in the SHU pending a transfer of all three inmates to three different corrections facilities. *See* Tr. at 128–29; Def.Ex. A–8–11.[8] In addition to the evidence of a prior physical altercation between the three inmates, and the evidence that Thomas and the plaintiff may have set the fire in Flower's cell, Wong testified that at least two of these three inmates informed him that once they were released from the SHU, they would "settle the matter" by themselves. *See id.* at 139, 141–42. Faced with what Wong perceived to be a very real prospect for future violence between the three inmates, Wong concluded that the interests of security required that these inmates be separated from each other. *See* Tr. at 127, 139.

Although Wong found that the plaintiff should remain in the SHU for security pur-

---

**8.** Wong's disposition was subsequently affirmed by the defendant Superintendent of Green Ha- ven Scully. *See* Def.Ex. A–11.

poses, the Court notes that Wong also concluded that the evidence against the plaintiff with respect to the accusations of arson and extortion was inconclusive. *See* Tr. at 141. This conclusion was duly indicated on the Superintendent's Proceeding Worksheet. *See* Def.Ex. A–8. Moreover, the Superintendent's Proceeding Report, which set forth in writing the reasons for plaintiff's continued segregation, contained no findings with respect to the issue of plaintiff's guilt or innocence, but instead concluded that the plaintiff should remain in the SHU pending transfer "[f]or the safety and protection of each of the inmates." *See* Def.Ex. A–10.

Following Wong's disposition, but before the plaintiff could be transferred to another correctional facility, on March 2, 1981 plaintiff instituted an Article 78 proceeding before the New York Supreme Court, Dutchess County, challenging his confinement in the SHU. The Article 78 proceeding was initially scheduled for April 24. However, when plaintiff was transferred to Attica on April 22, the Article 78 proceeding was temporarily postponed. *See* Tr. at 16.

Consistent with defendant's contention that plaintiff was placed in the SHU at Green Haven for security purposes, the plaintiff was released into the general prison population at Attica. *See* Tr. at 26. The plaintiff remained in the general population for a little over a month, until, on May 24, 1981, prison officials again had to place the plaintiff in involuntary protective custody. The former Deputy Superintendent for Security at Attica, Charles James, testified that while the plaintiff was in the general population at Attica, the prison was having problems with extortion amongst the inmates. *See id.* at 79. James had received written and oral reports from inmates and prison guards claiming that the plaintiff was one of the ringleaders in an extortion ring. *See id.* at 79. James also received anonymous letters from inmates threatening to kill the plaintiff for his involvement in the extortion. *See id.* at 79; Pl.Ex. C.

Based on the allegations and threats made against the plaintiff, James believed that the plaintiff was involved in the extortion and that the plaintiff should be placed in "administrative protective custody" pending a transfer to another correctional facility. *See* Tr. at 90, 105. According to James' testimony, administrative protective custody is simply Attica's term for involuntary protective custody in the SHU. *See id.* On June 5, 1981, pursuant to James' order, the plaintiff was transferred from Attica to Great Meadow Correctional Facility ("Great Meadow"). *See* Tr. at 79. The inmate transfer order indicated that plaintiff's transfer was necessary to keep him "separate from unknown enemies." *See* Pl.Ex. B.

Plaintiff's Article 78 proceeding was transferred to the New York Supreme Court in Washington County along with plaintiff's transfer to Great Meadow. *See* Transcript of Article 78 Proceeding ("Art. 78 Tr.") at 2. In that Article 78 proceeding, which was held on August 20, 1981, the plaintiff was represented by counsel. Plaintiff complained that he was "deprive[d] … of considerable rights and liberties in the prison" when he was "wrongfully incarcerated for eighty-nine days in the special protection unit" at Green Haven. *See id.* at 2, 4. Plaintiff also argued that his confinement constituted cruel and unusual punishment. *See id.* at 3. After reviewing all of the records in the case, the court held that "all required procedural steps were scrupulously taken," that the hearing officer was "within [his] authority and discretion" in ordering the petitioner confined to the SHU and that there was no "violation or deprivation of any rights of the petitioner." *See id.* at 10. The court also noted that, in any event, the proceeding was moot because the plaintiff was no longer in involuntary protective custody. *See id.* at 11.

## DISCUSSION

Plaintiff's primary claim is that the prison officials at Green Haven denied him due process because they used a pur-

ported involuntary protective custody proceeding as a pretext to continue his confinement in the SHU for disciplinary reasons, without ever finding him guilty of any infraction. *See* Tr. at 157; Plaintiff's Proposed Findings of Fact at ¶ 9. The plaintiff also complains that he was denied his due process rights at the superintendent's hearing in that he was denied the assistance of a prison staff member, he was not allowed to cross-examine or hear the testimony of the witnesses against him, and he was not provided with a statement setting forth the reasons why his confinement in the SHU was to be continued. *See* Complaint at 4. Finally, the plaintiff argues that the defendants violated his constitutional right of access to the courts by transferring him from Green Haven to Attica and then to Great Meadow in an attempt to thwart his right to the Article 78 proceeding.[9] *See id.;* Plaintiff's Proposed Findings of Fact at ¶ 7. Each of these claims are wholly without merit.

■ Plaintiff's claim that he was placed in involuntary protective custody at Green Haven merely as a pretext for a disciplinary confinement[10] is without any factual support and therefore must be rejected. The plaintiff has presented the Court with nothing more than bald and conclusory allegations that his continued confinement in the SHU was for disciplinary reasons. On the other hand, the evidence presented by

---

**9.** Defendants argue in their post-trial brief that plaintiff's Article 78 proceeding is *res judicata* and bars plaintiff's present action for damages pursuant to § 1983. Whatever the merits of this argument at the time when the defendant initially briefed this issue, the Second Circuit has since made it clear that a prior Article 78 proceeding does not bar a subsequent § 1983 action for damages. *See Davidson v. Capuano,* 792 F.2d 275 (2d Cir.1986).

Defendants also argue in their post-trial brief that the plaintiff is collaterally estopped from relitigating the same issues raised before the state court in the Article 78 proceeding and that the Court should dismiss plaintiff's entire cause of action on this ground. In actions pursuant to § 1983, the Court must give the same collateral estoppel effect to the prior state court judgment as would the state courts from which the judgment emerged. *See Migra v. Warren City School District,* 465 U.S. 75, 81, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984); *Allen v. McCurry,* 449 U.S. 90, 96, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980); *cf. University of Tennessee v. Elliott,* — U.S. ——, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986). Thus, in accordance with New York law, the plaintiff is collaterally estopped from relitigating issues which he had a full and fair opportunity to litigate in a prior proceeding, which were actually litigated, and which were determined finally on the merits. *See Schwartz v. Public Administrator,* 24 N.Y.2d 65, 71, 246 N.E.2d 725, 729, 298 N.Y.S.2d 955, 960 (1969). Clearly, the Article 78 proceeding, in which the plaintiff was represented by counsel, afforded plaintiff a full and fair opportunity to litigate the issues raised in that proceeding. *See See Powell v. Ward,* 643 F.2d 924, 943 (2d Cir.), *cert. denied,* 454 U.S. 832, 102 S.Ct. 131, 70 L.Ed.2d 111 (1981); *Wilson v. Pfeiffer,* 565 F.Supp. 115, 117–118 (S.D.N.Y.1983); *cf. Winters v. Lavine,* 574 F.2d 46, 58 n. 14 (2d Cir.1978). Moreover, although the state court in the Article 78 proceeding ruled in the alternative that plaintiff's claims were moot, *see* Art. 78, Tr. at 10, because the court also dismissed plaintiff's claims on the merits, collateral estoppel would still apply. This is especially so in light of the state court's rather cursory discussion of the mootness point. *See Winters,* 574 F.2d *supra* at 67; *Wilson,* 565 F.Supp. *supra* at 117; *GTF Marketing, Inc. v. Colonial Aluminum Sales, Inc.,* 108 A.D.2d 86, 488 N.Y.S.2d 219 (2d Dept.1985); 1B J. Moore, W. Taggart & J. Wicker, Federal Practice ¶ 0.443 at 3901–02 (2d ed. 1982).

However, the Court is not persuaded that defendant has demonstrated that the issues litigated in the Article 78 proceeding were identical to the issues presented in the instant action. In the Article 78 proceeding, the plaintiff simply argued that he was "wrongfully" confined in the SHU. The only constitutional deprivation alleged in that proceeding was that the confinement constituted cruel and unusual punishment. *See* Art. 78, Tr. at 2–4. Moreover, the state court simply concluded that the prison officials were justified in confining the plaintiff and that "all required procedural steps were scrupulously taken." *See id.* at 10.

Certainly, the propriety of the plaintiff's transfer to Attica and then to Great Meadow was never raised or litigated in the state court. Moreover, the plaintiff never argued in the state court that his due process rights were violated or, more specifically, that the involuntary custody proceeding was a pretext to issue disciplinary sanctions. Under these circumstances, the Court declines to reject plaintiff's claims on the grounds of collateral estoppel.

**10.** In *Hewitt v. Helms,* 459 U.S. 460, 476 n. 9, 103 S.Ct. 864, 873 n. 9, 74 L.Ed.2d 675 (1983), the Supreme Court noted "[o]f course, administrative segregation [for security reasons] may not be used as a pretext for indefinite confinement of an inmate."

the defendants, which largely remains undisputed, overwhelmingly supports the conclusion that the plaintiff was never confined in the SHU for disciplinary reasons.

The Inmate Misbehavior Report and the subsequent adjustment committee hearing indicate that the prison officials initially contemplated disciplinary action. However, it does not follow from that circumstance that plaintiff was ever placed in disciplinary confinement. The plaintiff's initial confinement, from February 2 until the conclusion of the superintendent's hearing on February 13, was clearly on an adjustment admission basis. *See* n. 3 *infra;* 7 NYCRR § 304.1(d). Thus, the evidence establishes that plaintiff was initially properly held in the SHU, not as a disciplinary sanction, but merely so that he would be segregated from the general prison population for a short period of time pending the disposition of the superintendent's proceeding.

Moreover, by the time plaintiff received the formal charge on February 5, it was clear that the prison officials were no longer contemplating any disciplinary action but only whether the plaintiff should be placed in involuntary protective custody. Indeed, the formal charge received by the plaintiff plainly indicates that the superintendent's proceeding would only determine if the plaintiff should be placed in involuntary protection status. This is consistent with Wong's testimony, which the Court finds credible, that he only set out to determine if the plaintiff should be segregated and transferred for security reasons.

The superintendent's worksheet, which set forth the reasons for Mr. Wong's decision to continue plaintiff's confinement in the SHU, also indicated that the plaintiff should be segregated "for the safety and protection of each of the inmates." *See* Def.Ex. A–8. Moreover, when plaintiff's transfer to another institution was consummated and, therefore, the risk of future violence between the plaintiff, Flowers, and Thomas had disappeared, the plaintiff was immediately placed in the general population. Plaintiff did not receive any loss of good time credits as a result of his confinement. Clearly, plaintiff's confinement for security reasons was not used by the defendants, as plaintiff alleges, as a pretext to administer disciplinary sanctions.

The Court also notes that Mr. Wong was clearly acting within his discretion when he concluded that the plaintiff should be segregated from the general population for security reasons. Both Sergeant Cheers and Officer Dore reported to Mr. Wong that other inmates were accusing the plaintiff and Thomas of the arson in Flowers' cell. In addition, there was evidence that the plaintiff, Flowers, and Thomas had been involved in a prior physical altercation and the inmates had told Wong that once they were released from the SHU they would settle their differences by themselves. The accusations of the plaintiff's involvement in the arson, whether right or wrong, and the threat of future violence between the inmates, clearly posed a substantial threat to plaintiff's safety as well as the general security of the prison necessitating plaintiff's continued confinement in the SHU. *See Sher v. Coughlin,* 739 F.2d 77, 82 (2d Cir.1984). *Cf. Hewitt v. Helms,* 459 U.S. 460, 474, 103 S.Ct. 864, 872, 74 L.Ed.2d 675 (1983) ("rumor, reputation and even more imponderable factors may suffice to spark potentially disastrous incidents" in "the violatile atmosphere of a prison.").

Plaintiff's claim that he was denied constitutionally mandated procedural rights at the Green Haven superintendent's hearings must also be rejected. First plaintiff's assertions in his complaint that he was denied the assistance of a prison staff member and that he was not given a statement of the reasons for his continued confinement in the SHU, *see* Complaint at p. 3, are factually unsupported. Indeed, at trial, plaintiff never claimed that he was deprived of these rights created by state law. Nor was plaintiff's due process violated by the fact that plaintiff was not allowed to cross-examine or hear the testimony of the witnesses against him.

■ At the outset, it should be noted that the state law regulatory structure in existence in New York in 1981 sufficiently circumscribed the discretion of prison officials to place an inmate in involuntary protective custody so as to create a liberty interest cognizable under the Fourteenth Amendment. *Cf. Hewitt,* 459 U.S. *supra* at 472, 103 S.Ct. *supra* at 871 (1983); *compare Deane v. Dunbar,* 777 F.2d 871, 876 (2d Cir.1985) (close question as to whether New York regulations in 1973 created a liberty interest; unlike the 1981 regulations, the 1973 regulations did not provide for hearing or review procedures which might limit the prison official's discretion). Nonetheless, in the context of involuntary protective custody the Due Process Clause only requires that the inmate "receive some notice of the charges against him and an opportunity to present his views [ordinarily only in writing] to the prison official charged with deciding whether to transfer him to administrative segregation." *See Hewitt,* 459 U.S. *supra* at 476, 103 S.Ct. *supra* at 873.[11] In short, the only process due an inmate who is to be placed in administrative segregation is an "informal, non-adversary evidentiary review." *See id.* Measured against these requirements, the plaintiff was clearly afforded all of the constitutionally required procedural requirements to which he was entitled.

Thus, the plaintiff did receive prompt notice of the reasons for the segregation in the SHU, the plaintiff was afforded an ample opportunity to present his views to Mr. Wong, and the prison officials reviewed the evidence against the plaintiff one day after he was placed in the SHU and again ten days later. Indeed, the prison officials in this case, in accordance with New York's regulations, afforded the plaintiff procedural protections which went well beyond the requirements of the Due Process Clause. For example, the plaintiff was offered investigatory assistance, the

superintendent's hearing was postponed so that Mr. Wong could conduct an interview requested by the plaintiff of another witness, and the plaintiff was allowed to present his position orally to Mr. Wong. Therefore, plaintiff's claim that he was denied process is without merit.

■ Plaintiff's final claim, that the defendants violated his constitutional right of access to the courts by transferring him from Green Haven to Attica and then to Great Meadow, is equally meritless. While it is well-settled that an inmate in New York has no due process liberty interest in not being transferred from one correctional facility to another, *see Montanye v. Haymes,* 427 U.S. 236, 243, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976); *Meachum v. Fano,* 427 U.S. 215, 216, 224–25, 96 S.Ct. 2532, 2534, 2538, 49 L.Ed.2d 451; *Sher, supra,* 739 F.2d at 80, it is also well-settled that a prisoner may not be transferred solely in retaliation for the exercise of his constitutional rights. *See Haymes v. Montanye,* 547 F.2d 188, 191 (2d Cir.1976), *cert. denied,* 431 U.S. 967, 97 S.Ct. 2925, 53 L.Ed.2d 1063 (1977); *McDonald v. Hall,* 610 F.2d 16, 18 (1st Cir.1979); *Respress v. Coughlin,* 585 F.Supp. 854, 857 (S.D.N.Y. 1984); *Hasan Jamal Abdul Majid v. Henderson,* 533 F.Supp. 1257, 1270 (N.D.N.Y.), *aff'd,* 714 F.2d 115 (2d Cir.1982). To establish a claim of retaliatory transfer, however, the plaintiff must prove that he would not have been transferred but for the filing of his Article 78 proceeding. *See McDonald,* 610 F.2d *supra* at 18, *Respress, supra,* 585 F.Supp. at 858. Plaintiff has clearly not satisfied this burden.

■ As noted above, Wong's decision to transfer the plaintiff was based solely on his concern for security. Indeed, the evidence establishes that Wong was not even aware that plaintiff had filed his Article 78 proceeding when the transfer order was issued. *See* Tr. at 129. Moreover, the

---

**11.** The Court notes that the Supreme Court has held that the same minimal due process requirements which apply to involuntary protective custody proceedings also apply to confinements pending the disposition of superintendent's proceedings, regardless of whether the contemplated proceedings are disciplinary or administrative. *See Hewitt,* 459 U.S. *supra* at 476, 103 S.Ct. *supra* at 873.

Court finds credible Mr. James testimony that the plaintiff was transferred from Attica due to James' belief that the plaintiff was extorting other inmates and that plaintiff's life was threatened. Therefore, plaintiff's claim of retaliatory transfer must be denied.

## CONCLUSION

As the foregoing discussion makes evident, plaintiff's claims pursuant to § 1983 are without merit and must be dismissed. The Clerk of the Court is therefore directed to enter judgment for the defendants accordingly.

It is SO ORDERED.