Phillip WALLACE, Plaintiff–Appellant,

v.

Merle Dean ROBINSON, et al., Defendants–Appellees.

No. 88–1806.

United States Court of Appeals, Seventh Circuit.

Argued June 11, 1991.

Decided Aug. 9, 1991.

---

Jerold S. Solovy, William A. VonHoene, Jr., and Thomas S. O'Neill (argued), Jenner & Block, Chicago, Ill., for plaintiff-appellant.

Diane Curry Grapsas, Rosalyn B. Kaplan (argued), Asst. Attys. Gen., Office of the Atty. Gen., and Daniel N. Malato, Asst. Atty. Gen., Office of the Atty. Gen., Civ. Appeals Div., Chicago, Ill., for defendants-appellees.

Before BAUER, Chief Judge, and CUMMINGS, WOOD, Jr., CUDAHY, POSNER, COFFEY, FLAUM, EASTERBROOK, RIPPLE, MANION and KANNE, Circuit Judges.

EASTERBROOK, Circuit Judge.

■ We took this case in banc to resolve a conflict within the circuit. *Castaneda v. Henman*, 914 F.2d 981, 984 (7th Cir.1990), holds that a regulation allowing prison officials discretion to act for any reason except discipline does not establish a liberty or property interest for the purpose of the due process clause. An earlier case, *Abdul-Wadood v. Duckworth*, 860 F.2d 280, 284–85 & n. 7 (7th Cir.1988), implies a contrary answer, which the panel in this case turned into a holding, 914 F.2d 869, 873–75 (7th Cir.1990). We conclude that a rule giving prison officials discretion to act for any reason, but placing restraints on their options if their motive is disciplinary, creates neither a liberty nor a property interest. Liberty and property interests depend on substantive rules governing entitlements; rules addressed to motive that do not require particular action to follow particular facts lack the sort of substantive constraints necessary to create liberty or property interests. To the extent it holds the contrary, *Abdul-Wadood* is overruled.

## I

Like many other states, Illinois expects its prisoners to work during their incarceration. Ill.Rev.Stat. ch. 38 ¶ 1003–12–1 provides that the Department of Corrections "shall, in so far as possible, employ at useful work committed persons confined in institutions". Illinois credits the prisoners' accounts with pay for the work performed. Some of the jobs within prison are preferable to others, not only because the working conditions are less onerous but also because they are higher paying. Phillip Wallace held one of the better jobs in the Stateville prison: the tailor shop. The job paid $100 per month and did not require heavy labor.

Illinois does not give every prisoner a right to hold a job, or any particular job.

The parties agree that no statute, regulation, or practice with the force of a regulation curtails the discretion of prison officials to assign a prisoner to any job on whim. Illinois does, however, restrict prison officials' ability to act for particular reasons. The principal restrictions govern discipline. Ill.Rev.Stat. ch. 38 ¶ 1003–8–7(b)(2) provides that "[d]isciplinary restrictions on visitations, work, education or program assignments ... shall be related as closely as practicable to abuse of such privileges or facilities." Subparagraph 7(e) continues:

> (e) In disciplinary cases which may involve ... a change in work, education, or other program assignment of more than 7 days duration, the Director shall establish disciplinary procedures consistent with the following principles: ...
>
> (6) A change in work, education, or other program assignment shall not be used for disciplinary purposes except as provided in paragraph (b) of this Section and then only after review and approval under Section 3–8–3.

Regulations issued under § 3–8–3 establish elaborate procedures to use in disciplinary cases. The upshot is that when discipline is the end in view the prison may change job assignments only for "abuse of such privileges or facilities" (at least when that is "practicable"), and then only after following prescribed steps.

Stateville changed Wallace's assignment from the tailor shop to a job as a clerk, which pays only $30 per month. The parties do not agree on the reasons for this switch. Wallace chalks it up to his supervisor's discovery of home-brewed liquor (hooch) in a cabinet near Wallace's work station in the tailor shop. Merle Robinson, supervisor of the tailor shop, brought this to the attention of the prison's Assignment Committee, blaming Wallace; Wallace replied that he had nothing to do with the hooch and that other inmates had access to the cabinet. Stateville submits that Wallace was transferred because he did not get along with Robinson and because he abused his position by failing to return for work after lunch—a habit into which some prisoners had fallen. Wallace concedes that he skipped the afternoon session of work but contends that Robinson's notice reminding inmates that they must work the full day was posted while he was away from work for legitimate reasons. Wallace filed this action under 42 U.S.C. § 1983, seeking a jury trial to determine the reason he was removed from the tailor shop. His theory is that if the prison's motive was disciplinary, the transfer deprived him of liberty or property without due process of law.

Supervisors in Illinois prisons cannot transfer inmates on their own. Inmates have access to an elaborate administrative system. Wallace protested Robinson's intention to sack him. Stateville appointed an officer to investigate. The investigator took evidence (including Wallace's statement) and concluded that on March 24, 1986, Wallace failed to report for work after lunch and no one knew his whereabouts. Another report stated that Wallace possessed hooch. After receiving this information the Assignment Committee recommended Wallace's removal from the tailor shop, explaining:

> It was felt that such action was justified in order to preclude more serious problems between Wallace and Supervisor Robinson. However, this should not be construed as disciplinary action and the inmate was advised that he has a right to file a grievance as he chooses.

Wallace so chose, complaining to the Institutional Inquiry Board. The Board sustained the Assignment Committee's decision, noting:

> IIB is of the opinion inmate should be reviewed again by the assignment committee for possible placement on a job assignment that is comparable to the one he lost.... Assignment Committee G Dorm [will] review inmate Wallace, A–1574[3], for possible comparable assignment as tailor shop.

The next stop was the state-wide Administrative Review Board. This Board reviewed all of the proceedings and affirmed the Institutional Inquiry Board's decision, reiterating its request that the Assignment Committee seek a comparable placement

for Wallace. After Michael Lane, then Director of the Department of Corrections, reviewed this decision, it became final. Wallace sought a comparable placement but did not receive one. Only industrial jobs at Stateville pay as much as $100 per month. Industrial jobs are available only with the permission of the supervisors, and none of the industrial supervisors wants Wallace in his shop. He has remained a clerk and seeks damages to make up for lost income.

Defendants (Director Lane, Warden O'Leary, Supervisor Robinson, and Zenon Symanski, the Supervisor of Industry at Stateville) tendered the administrative record and moved for summary judgment. The district court granted that motion, giving three reasons: (1) "that plaintiff has no property/liberty interest in his assignment"; (2) that "his reassignment was not done arbitrarily and capriciously"; and (3) that in any event Wallace "has received all of the process due him". Wallace contests all three conclusions. The first is correct; as it is also dispositive, we shall stop there.

## II

Illinois has a rule of the form: "The warden may do $A$ for any reason, but if that reason is $M$ the warden must prove $M$ before acting." One could restate this as: "The warden may do $A$ for any reason except $M$." $A$ in our case is changing the prisoner's job assignment. $M$ is misconduct. Wallace may have taken hooch to his job at the tailor shop, which violates a rule of the prison. He may have been a goldbrick, knocking off work early. He may have gotten his supervisor's goat, which violates no rule but may make it wise to move him. Or he may have done all three. Whether the state employed procedures adequate to find the "true" reason matters only if a rule in the form we have described creates a liberty or property interest.

Only statutes or rules attaching consequences to particular circumstances give prisoners liberty or property interests. *Kentucky Department of Corrections v. Thompson*, 490 U.S. 454, 460–63, 109 S.Ct. 1904, 1908–10, 104 L.Ed.2d 506 (1989).

Weasel words such as "in so far as possible" in ¶ 1003–12–1 show that Illinois has not assured its inmates any job, let alone the job the inmate prefers. The warden therefore could switch Wallace from tailor to clerk on learning that he burned the trousers, or did not return after lunch, or sassed his supervisor—or for no particular reason at all. Paragraph 1003–12–1 does not create a liberty or property interest. *Joihner v. McEvers*, 898 F.2d 569, 571 (7th Cir.1990).

Wallace hangs his hat on ¶ 1003–8–7(b)(2) and (e)(6), the restriction on disciplinary transfers. Does this language create a "legitimate claim of entitlement"? If not, there is no constitutional liberty or property. *Thompson*, 490 U.S. at 460, 109 S.Ct. at 1908; *Board of Pardons v. Allen*, 482 U.S. 369, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987); *Olim v. Wakinekona*, 461 U.S. 238, 248–51, 103 S.Ct. 1741, 1747–48, 75 L.Ed.2d 813 (1983); *Hewitt v. Helms*, 459 U.S. 460, 469–72, 103 S.Ct. 864, 870–72, 74 L.Ed.2d 675 (1983); *Connecticut Board of Pardons v. Dumschat*, 452 U.S. 458, 101 S.Ct. 2460, 69 L.Ed.2d 158 (1981); *Greenholtz v. Nebraska Inmates*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979); *Meachum v. Fano*, 427 U.S. 215, 225–29, 96 S.Ct. 2532, 2538–40, 49 L.Ed.2d 451 (1976); *Montanye v. Haymes*, 427 U.S. 236, 242–43, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976); *Wolff v. McDonnell*, 418 U.S. 539, 557–58, 94 S.Ct. 2963, 2975–76, 41 L.Ed.2d 935 (1974); *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). A "legitimate claim of entitlement" means more than an abstract desire. It is instead an entitlement contingent on facts, something you hold unless prescribed conditions of its defeasance can be established. *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709; *Thompson*, 490 U.S. at 462–63, 109 S.Ct. at 1909–10; *Fleury v. Clayton*, 847 F.2d 1229, 1231–32 (7th Cir.1988). Something "securely and durably yours ... as distinct from what you hold subject to so many conditions as to make your interest meager, transitory, or uncertain". *Reed v. Village of Shorewood*, 704 F.2d 943, 948 (7th Cir.1983). How securely? Your entitle-

ment must be "legally enforceable", *O'Bannon v. Town Court Nursing Center*, 447 U.S. 773, 788 n. 21, 100 S.Ct. 2467, 2477 n. 21, 65 L.Ed.2d 506 (1980); *Upadhya v. Langenberg*, 834 F.2d 661, 665 (7th Cir.1987). Or in the formulation of *Thompson* there must be " 'explicitly mandatory language,' in connection with the establishment of 'specified substantive predicates' to limit discretion". 490 U.S. at 463, 109 S.Ct. at 1910.

Wallace could be moved from one job to another for almost any reason. Any prisoner's interest in the job-of-preference is "meager, transitory, [and] uncertain". Prison tailors lack a "legally enforceable" interest in that job, as opposed to some other. It follows that Wallace had no liberty or property interest in being a tailor.

Now Wallace responds that although the prison may give him a new job because the warden does not like the cut of his jib, he has a legitimate claim of entitlement not to lose his position as a tailor because of misconduct unless, through proper procedures, the prison shows that the misconduct took place and is job-related. At oral argument counsel restated this as a legitimate claim of entitlement to a decision on the question whether he put hooch in the cabinet. Either formulation uses the language of *Roth* but is of different character from a statement such as: "I have a legitimate claim of entitlement *to the job* unless good reasons have been established." Wallace lacks this latter kind of claim. Yet only the latter claim is liberty or property for constitutional purposes, given *Thompson* and *Roth*.

Due process comes into play when substantive rules limit the reasons that support action. Procedures ensure that the necessary basis exists. Sometimes the Constitution itself may supply this restraint, a possibility *Thompson* discussed, 490 U.S. at 460–61, 109 S.Ct. at 1908–09; the cruel and unusual punishments clause of the eighth amendment, for example, would have something to say about unending solitary confinement even if state rules gave the warden complete discretion over the subject. Nothing comparable puts a damper on job assignments. So long as "the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not by itself subject an inmate's treatment by prison authorities to judicial oversight." *Montanye*, 427 U.S. at 242, 96 S.Ct. at 2547.

When there are no necessary conditions of action, there is nothing to hold a hearing about. Suppose Illinois were to give Wallace another hearing before the disciplinary (rather than the assignment) board, and the panel were to determine that Wallace did not put the hooch in the cabinet. Would Wallace then be secure against a change of jobs? Not at all. The warden or his delegate the assignment board still may say: "Fine, but prisoners who do not get along with their supervisors should move." That is that; no substantive rule, no "explicitly mandatory language", prevents the prison from making the switch. Nothing Wallace could say, no fact he could prove, would establish his entitlement to stay in the tailor shop. So there is no liberty or property interest.

■ Rules of the form "The state may do *A* for any reason except *M*" and "The state may do *A* for any reason, but if that reason is *M* the state must prove *M* before acting" are ubiquitous. There is no such thing as unbridled discretion in American law. No state may penalize protected expression or discriminate because of race. So a rule that at first glance allows a warden to act for any or no reason really means: "The warden may do *A* [give the prisoner a new job] for any reason except *M* [race, speech, and so on]." See *Dumschat*, 452 U.S. at 467, 101 S.Ct. at 2465 (Brennan, J., concurring). Do these limits on official discretion create liberty or property interests? *Montanye* holds that they do not.

New York moved Haymes from its prison at Attica to the one at Clinton. Haymes contended that the warden was retaliating for Haymes' efforts to give legal assistance to other prisoners. He argued—and New York conceded—that the rule in force

effectively meant that "the warden may transfer a prisoner for any reason except activities protected by the first amendment." The Court held that this rule did not create a legitimate claim of entitlement, because no facts Haymes could establish at a hearing would entitle him to remain in Attica. 427 U.S. at 243, 96 S.Ct. at 2547. Even if he could establish beyond doubt that the warden's original decision was based on speech, the state could transfer him anyway, for a different (or no) reason. There was accordingly no need for a pretransfer hearing. A transfer motivated by speech could violate the Constitution, but the bar would come from the first amendment and not the due process clause. Indeed, on remand the Second Circuit held that the state may have retaliated for protected speech. *Haymes v. Montanye*, 547 F.2d 188 (2d Cir.1976). Remedy came from the first amendment.

■ If New York had regulations saying: "Wardens may transfer prisoners for any reason except speech", the result would have been no different. The prisoner's *entitlement* is the same whether the rule comes from state law and the exceptions from federal law, or both have the same source. Cf. *Howlett v. Rose*, — U.S. ——, 110 S.Ct. 2430, 2439, 110 L.Ed.2d 332 (1990) ("'federal' law is part of the Law of the Land in the State"). In either case, the prisoner has no right to remain in a particular prison unless specified facts exist. Putting one (or more) grounds off limits therefore does not create liberty or property. You can imagine regulations that put *so many* grounds off limits that they indeed establish substantial constraints on discretion. An exhaustive list of "exceptions" can be the equivalent of a mandatory rule. So, too, a state might establish criteria for decision that create a legitimate claim of entitlement even if they do not eliminate all discretion. *Board of Pardons v. Allen*, 482 U.S. at 375–78, 107 S.Ct. at 2419–21. But Illinois has put restrictions on only one ground of action, and the remaining field of discretion is so large that no prisoner has a legitimate claim of entitlement to a particular job placement, no matter what the facts may be.

Promises of particular procedures also do not create legitimate claims of entitlement. Consider the form: "The state may do *A* for any reason, but if the reason is *M* the state must hold hearings before acting." One could describe this as a legitimate claim of entitlement to retain one's current status until the completion of hearings, or as a legitimate claim of entitlement to a decision by the appointed officials. But *Olim* held that a state's promise of procedural safeguards does not create a property interest. Hawaii promised prisoners that it would not transfer them in advance of hearings. Wakinekona was transferred without hearings, and the court of appeals thought this deprived him of his legitimate claim of entitlement to process. In reversing that decision, the Court remarked that "[p]rocess is not an end in itself. Its constitutional purpose is to protect a *substantive* interest to which the individual has a legitimate claim of entitlement." 461 U.S. at 250, 103 S.Ct. at 1748 (emphasis added). See also *Doe v. Milwaukee County*, 903 F.2d 499, 502–03 (7th Cir. 1990). A prisoner whose job assignment may be changed for any reason lacks such a substantive interest, even if the state has promised elaborate procedures before using a particular reason (misconduct) as the basis of action.

Practical reasons support these precedents. Using criteria of state law to define liberty that in turn activates the due process clause converts state entitlements into constitutional ones. Yet states have legitimate interests in freedom from federal oversight as they attempt to devise and implement their own rules. Violations of state law do not automatically offend against the Constitution too. *Archie v. Racine*, 847 F.2d 1211, 1215–18 (7th Cir. 1988) (in banc); *Dawson v. Milwaukee Housing Authority*, 930 F.2d 1283, 1286 (7th Cir.1991). A rule that the existence of a liberty or property interest depends on the "true" reason for the state's decision implies a need to review the very question of state law that the adjustment committee of the prison decided. The Constitution is not supposed to transfer to federal court all questions concerning prison governance,

although that would be the upshot of a motive-centered approach. There is at all events no reason to think that federal courts would be very good at determining the dominant motive behind prison officials' acts. *Castaneda*, 914 F.2d at 984 (calling such an inquiry "fruitless and impossible").

Rules concerning process must be established in advance. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 546–48, 98 S.Ct. 1197, 1213–14, 55 L.Ed.2d 460 (1978). The warden must know *before* acting whether the Constitution requires a hearing. An opinion from a federal court saying "You need to offer a hearing if you act for reason *M*, but not if you act for reason *Q* or *Z*, and we will collect damages if you do not offer a hearing and we think your real reason was *M*", leads to one of two outcomes. Either prisons will extend hearings in every case or a federal court will retry the prison's decision in order to determine the "true" reason—and thus whether a hearing was necessary. Trials to determine the procedures that should have been used are wasteful, and the threat of choosing procedures after the fact throws a monkey wrench into the administrative process.

Prudence, then, reinforces the positivist approach of cases such as *Thompson* and *Montanye*. States may define for themselves the entitlements their prisoners will possess. Illinois has not created a legitimate claim of entitlement to hold one job rather than another. Wallace lacks a liberty or property interest. Because the due process clause does not apply to his transfer, the judgment is

AFFIRMED.

CUDAHY, Circuit Judge, joined by CUMMINGS, Circuit Judge, dissenting.

This unusual case was voted en banc not out of dissatisfaction with the result reached by Judge Sneed for the panel, 914 F.2d 869 (7th Cir.1990), *vacated,* 922 F.2d 409 (7th Cir.1991), but because of doubts regarding the panel majority's rationale. Yet the analysis now advanced by the en banc majority is unprecedented, unsupported by Supreme Court authority and in conflict with the analysis employed by every other federal circuit. Repudiating the fundamental distinction between punitive and predictive judgments that appears to be embedded in the law of every state, the en banc majority holds that Illinois law does not grant prisoners a substantive entitlement to prison employment. But the en banc majority poses the wrong question. The issue is not whether Illinois law creates a liberty or property interest in prison employment but rather whether Illinois law proscribes the arbitrary infliction of punishment. By artfully framing the question in this way, however, the en banc majority orchestrates its answer.

It is all too easy to overlook the reasoning the majority employs because what is at stake here—Phillip Wallace's removal from the job of prison tailor—may seem insignificant.[1] Yet the Supreme Court has disavowed distinctions that are grounded in the apparent weight of the particular interest at issue in a given case. *See Kentucky Dept. of Corrections v. Thompson,* 490 U.S. 454, 461, 109 S.Ct. 1904, 1909, 104 L.Ed.2d 506 (1989) ("[t]he fact that certain state created liberty interests have been found to be entitled to due process protection, while others have not, is not the result of this Court's judgment as to what interests are more significant than others"). The Court has instead carefully examined the language of the relevant statutes and regulations. *See id.* The test articulated by the Court to determine whether the state has created a liberty or property interest protected by the Constitution is whether the state statute employs " 'explicitly mandatory language,' in connection

---

1. The outcome of this case may not seem significant but the reasoning upon which it rests is potentially far-reaching. Both the majority and the state readily concede that the same due process principles that govern prison jobs apply equally to the most drastic forms of prison segregation. By explicitly overruling *Abdul–Wadood v. Duckworth,* 860 F.2d 280 (7th Cir. 1988), a case involving commitment to disciplinary segregation, the majority makes abundantly clear that the rationale of this case extends beyond its unique facts.

with the establishment of 'specified substantive predicates' to limit discretion." *Id.* at 463, 109 S.Ct. at 1910 (quoting *Hewitt v. Helms*, 459 U.S. 460, 472, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983)).

A comprehensive network of laws and administrative regulations governs the administration of discipline within Illinois prisons. The very first line of Ill.Ann.Code § 1003–8–7 proclaims its mandate: "All disciplinary action shall be consistent with this Chapter." Paragraph 1003–8–7(b)(1) bans certain modes of discipline altogether while 7(b)(2) curtails the use of other forms of punishment, prescribing that "Disciplinary restrictions on visitations, work, education or program assignments, and the use of the prison's library shall be related as closely as practicable to abuse of such privileges or facilities." Paragraph 1003–8–7(e)(6) makes clear that, irrespective of the discretion granted prison officials in making non-disciplinary work transfers, "[a] change in work, education or other program assignment shall not be used for disciplinary purposes except" as provided in this section. And Paragraphs 1003–8–

7(c) to 7(e) enumerate the basic procedures the state requires prison officials to follow before meting out punishments for disciplinary infractions.

Further limits on official discretion are contained in the relevant regulations. Table A of Ill.Admin.Code § 504, for example, lists the maximum penalties that may be imposed for each sort of disciplinary infraction. The alleged infraction that Wallace claims was the reason for his transfer—possession of alcohol—appears on that schedule as offense number 203. § 504.20(a) of the regulations explicitly provides that "No committed person shall be found guilty of any violation of these rules without a hearing before the Adjustment Committee or Program Unit." And § 504.20(d) requires the Adjustment Committee to fashion any disciplinary change in the inmate's work program as closely as practicable to fit the abuse of work privileges.

I agree with Judge Sneed that, read together, Ill.Ann.Stat. ch. 38 § 1003–8–7 (1982)[2] and Ill.Admin.Code Tit. 20, § 504

**2.** § 1003–8–7 provides as follows:

§ 3–8–7. Disciplinary Procedures. (a) All disciplinary action shall be consistent with this Chapter. Committed persons shall be informed of rules of behavior and conduct, the penalties for violation thereof, and the disciplinary procedure by which such penalties may be imposed. Such rules, penalties and procedures shall be posted and issued to the persons committed.

(b)(1) Corporal punishment and disciplinary restrictions on diet, medical or sanitary facilities, clothing, bedding, mail or access to legal materials are prohibited, as are reductions in the frequency of use of toilets, washbowls and showers.

(2) Disciplinary restrictions on visitations, work, education or program assignments, and the use of the prison's library shall be related as closely as practicable to abuse of such privileges or facilities. This paragraph shall not apply to segregation or isolation of persons for purposes of institutional control.

(3) No person in the Adult Division may be placed in solitary confinement for disciplinary reasons for more than 15 consecutive days or more than 30 days out of any 45 day period except in cases of violence or attempted violence committed against another person or property when an additional period of isolation for disciplinary reasons is approved by the chief administrative officer.

(c) Review of disciplinary action imposed under this Section shall be provided by means of the grievance procedure under Section 3–8–8. A written report of the infraction shall be filed with the chief administrative officer within 72 hours of the occurrence of the infraction or the discovery of it and such report shall be placed in the file of the institution or facility. No disciplinary proceeding shall be commenced more than 8 calendar days after the infraction or the discovery of it unless the committed person is unable or unavailable for any reason to participate in the disciplinary proceeding.

(d) All institutions and facilities of the Adult Division shall establish, subject to the approval of the Director, procedures for hearing disciplinary cases except those that may involve the imposition of disciplinary isolation; the loss of good time credit under Section 3–6–3 or eligibility to earn good time credit; or a change in work, education, or other program assignment of more than 7 days duration.

(e) In disciplinary cases which may involve the imposition of disciplinary isolation, the loss of good time credit or eligibility to earn good time credit, or a change in work, education, or other program assignment of more than 7 days duration, the Director shall establish disciplinary procedures consistent with the following principles:

(1) Any person or persons who initiate a disciplinary charge against a person shall not

(1985)[3] create a liberty interest in freedom from the arbitrary infliction of punishment. This panoply of Illinois statutes and regulations meets the test because they set forth substantive predicates for punitive job deprivations and are mandatory in their thrust, repeatedly using the word "shall". *See Thompson,* 490 U.S. at 462–63, 109 S.Ct. at 1909–10. They reflect our society's collective judgment that punishment (or "discipline") should not be imposed without the obvious substantive predicate of a finding of guilt. *Cf. Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (mandating procedural safeguards to determine that prisoner is actually guilty of serious misconduct before exacting punishment of loss of good-time credits).

It is true that mere procedures, without more, do not necessarily indicate that a state has erected a liberty or property interest protected by the Constitution. *See Olim v. Wakinekona,* 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983); *Shango v. Jurich,* 681 F.2d 1091 (7th Cir.1982). But elaborate procedural safeguards are not irrelevant: they underscore the importance a state attaches to a particular interest. *See Shango,* 681 F.2d at 1101 ("[t]he existence of [state procedural] protections

may suggest the presence of a substantive limitation on official action"). Illinois has, moreover, gone beyond simply enacting procedures to regulate the administration of punishment—it has employed language of an unmistakably mandatory character and has established substantive guidelines to channel prison officials' discretion. The Illinois statute prescribes that disciplinary restrictions upon prison employment "shall be related as closely as practicable to abuse" of work privileges. The statute also guarantees the rudiments of due process, promising prisoners notice and a hearing before an impartial tribunal to determine guilt prior to the imposition of punishment.

Casting aside the explicit dictates of the Illinois statutes and regulations, however, the majority invokes the seemingly rigorous jargon of symbolic logic and concludes that Illinois law creates no liberty interest in freedom from arbitrary punishment. But the majority's algebraic protestations are unconvincing. According to the majority, a statute of the form "The state may do A for any reason, but if the reason is M the state must prove M before acting" creates no liberty interest. Because the state of

determine the disposition of the charge. The Director may establish one or more disciplinary boards to hear and determine charges. To the extent possible, a person representing the counseling staff of the institution or facility shall participate in determining the disposition of the disciplinary case.

(2) Any committed person charged with a violation of Department rules of behavior shall be given notice of the charge including a statement of the misconduct alleged and of the rules this conduct is alleged to violate.

(3) Any person charged with a violation of rules is entitled to a hearing on that charge at which time he shall have an opportunity to appear before and address the person or persons deciding the charge.

(4) The person or persons determining the disposition of the charge may also summon to testify any witnesses or other persons with relevant knowledge of the incident. The person charged may be permitted to question any person so summoned.

(5) If the charge is sustained, the person is entitled to a written statement of the decision by the persons determining the disposition of the charge which shall include the basis for the decision and the disciplinary action, if any, to be imposed.

(6) A change in work, education, or other program assignment shall not be used for disciplinary purposes except as provided in paragraph (b) of this Section and then only after review and approval under Section 3–8–3.

**3.** Ill.Admin.Code Tit. 20, § 504.20 provides in part:

The conduct identified in Table A shall be considered disciplinary infractions for which a penalty up to the maximum penalties listed may be imposed.

a) No committed person shall be found guilty of any violation of these rules without a hearing before the Adjustment Committee or Program Unit.

. . . .

c) Corporal punishment, disciplinary restrictions on diet, medical or sanitary facilities, clothing, bedding, mail, or access to legal materials and reductions in the frequency of use of toilets, washbowls and showers shall be prohibited.

d) Disciplinary restrictions on visitation, work, education or program assignments and use of the library shall be related as closely as practicable to the abuse of such privileges.

Illinois does not prohibit all job transfers but instead limits only those made for disciplinary reasons, the majority holds that Wallace's removal implicates no liberty interest. The majority purports to derive this formula from *Montanye v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976). Yet no Supreme Court case—including *Montanye*—compels such a result. *Montanye* merely holds that a New York statute placing absolutely no conditions upon prison officials' power to transfer inmates between prisons does not create a liberty interest in residence in a particular prison.

Formalistically concluding that the Illinois statute creates no liberty interest, the majority disregards the particular reasons behind Wallace's removal from his job as prison tailor. But it is the majority—and not the parties here—that espouses the radical position that the motives prompting official action are irrelevant. Only the majority believes that it makes no difference whether a prisoner is removed from his job or relegated to solitary confinement for disciplinary reasons rather than for administrative ones. The state of Illinois (as did the state of Indiana in *Abdul–Wadood*) concedes the importance of motive, vehemently insisting that Wallace was transferred because he did not get along with his supervisor and not because he was suspected of violating the prison rule prohibiting the possession of alcohol.

The majority's reluctance to scrutinize the motives behind official action may stem from its belief that such an inquiry is futile. Yet the Supreme Court has refused to relinquish the inquiry into motive despite similar protests from the dissenting justices regarding feasibility. *See Wilson v. Seiter,* —— U.S. ——, ——, 111 S.Ct. 2321, 2330, 115 L.Ed.2d 271 (1991) (holding that intent is an essential element of an Eighth Amendment violation over dissenters' protests that "the majority's intent requirement ... will prove impossible to apply"). Courts frequently delve into motive and the books are full of cases where such inquiries have been successfully undertaken. *E.g., Sher v. Coughlin,* 739 F.2d 77 (2d Cir.1984). In most cases, moreover, mo-

tives are not nearly as tangled as they are here and thus the problem of differentiating between punitive and predictive judgments is not quite so daunting.

Regardless of its difficulty, however, the inquiry into intent should not be abandoned simply because a majority of this court may believe that it is not cost-effective. The line that Illinois draws between disciplinary and administrative reasons for official action reflects a deeply-rooted belief in the importance of intent in this context. Motive and intent are, of course, the linchpins of all sorts of determinations in the law: accidental homicide may not be a crime but first-degree murder can carry the death penalty. And many resources have been consumed in delineating the differences between the two. As Justice Holmes once observed, "even a dog distinguishes between being stumbled over and being kicked." O. Holmes, *The Common Law* 3 (1881).

Judge Sneed's treatment of Illinois law in the panel opinion comports in all respects with the great body of precedent on this subject. *See Gilbert v. Frazier,* 931 F.2d 1581 (7th Cir.1991); *Solomon v. Zant,* 888 F.2d 1579 (11th Cir.1989); *Rust v. Grammer,* 858 F.2d 411 (8th Cir.1988); *Matiyn v. Henderson,* 841 F.2d 31 (2d Cir.), *cert. denied,* 487 U.S. 1220, 108 S.Ct. 2876, 101 L.Ed.2d 911 (1988); *Sheley v. Dugger,* 833 F.2d 1420 (11th Cir.1987); *Sher v. Coughlin,* 739 F.2d 77; *Parker v. Cook,* 642 F.2d 865 (5th Cir.1981); *Baptist v. O'Leary,* 742 F.Supp. 975 (N.D.Ill.1990); *Frankenberry v. Williams,* 677 F.Supp. 793 (M.D. Pa.), *aff'd,* 860 F.2d 1074 (3d Cir.1988); *Hilliard v. Scully,* 648 F.Supp. 1479 (S.D.N.Y.1986). Employing the same mode of analysis prescribed by the Supreme Court and applied in all these cases, Judge Sneed closely examined the language of the relevant statutes and regulations. He determined that Wallace's transfer from the job of prison tailor to the less lucrative post of prison clerk would implicate a liberty interest protected by the Constitution only if it had been made for disciplinary reasons.

The distinction between disciplinary and administrative judgments pervades the case law. In *Sher v. Coughlin,* 739 F.2d 77, for example, Sher alleged that he had been transferred from the Auburn Correctional Facility to the state prison in Attica and confined there to the Reclassification Unit because he was suspected of conducting an inmate scam. The Second Circuit rejected Sher's claim that the prison transfer violated due process, holding that neither the Fourteenth Amendment independently nor New York law accords an inmate a liberty interest in remaining at a particular prison facility. *See Montanye,* 427 U.S. 236, 96 S.Ct. 2543. With respect to Sher's claim that he was placed in solitary confinement for disciplinary reasons without due process, however, Judge Newman observed:

> When restrictive confinement within a prison is expressly imposed as a disciplinary sanction, for example, as a punishment ordered by an Adjustment Committee or a Superintendent's Proceeding in New York after a finding of misconduct, there will ordinarily be no doubt that the confinement impaired a liberty interest protected by state law and that the due process procedures specified in *Wolff* [, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974),] are therefore required. The state statutes and regulations authorizing restrictive confinement as punishment upon a finding of a disciplinary infraction *will invariably provide* sufficient limitation on the discretion of pris-

on officials to create a liberty interest.... However, the existence of a liberty interest grounded in state law is less easy to identify when, as in Sher's case, the prison officials purport to impose restrictive confinement for administrative reasons and the inmate alleges that their true motivation is punishment.

739 F.2d at 81 (emphasis added).[4] The Second Circuit adopted the approach taken by this circuit in *Abdul–Wadood,* 860 F.2d 280, and in the panel opinion in this case: it focused upon motive in order to determine whether Sher had been isolated for the purpose of punishment. *See also Gilbert,* 931 F.2d at 1581 (distinguishing between disciplinary and administrative segregation); *Matiyn,* 841 F.2d at 34 ("In analyzing intraprison restrictive confinements, this circuit has drawn a distinction between confinement as a disciplinary sanction and confinement as an administrative procedure."). Formulating the problem as one of dual motivation, the Second Circuit acknowledged that "prison officials had administrative reasons for transferring Sher out of Auburn and into the Reclassification Unit at Attica and may well have also felt that the resulting conditions of restrictive confinement would serve as a form of punishment." 739 F.2d at 82. To resolve this mixed-motive problem, the court relied upon the *Mt. Healthy* test, which teaches that state action prompted by both valid and invalid motives is not constitutionally tainted by the invalid motive if it would in any event have been taken on the constitu-

---

**4.** The Supreme Court has never directly addressed the question whether the due process clause itself, without regard to state law, places any limits upon official power to relegate prisoners to solitary confinement for disciplinary reasons. As the Second Circuit observed in *Sher:*

> Though the Supreme Court has ruled that punitive motivation is irrelevant in determining whether a prison transfer in New York impairs a liberty interest ..., the Court has thus far not reached the same conclusion with respect to an inmate's placement in conditions of restrictive confinement within a prison.... In ruling last year [in *Hewitt v. Helms*] that such confinement does not impair a liberty interest protected solely by the Fourteenth Amendment, without regard to state law, the Court was careful to note that it

was considering placement in restrictive confinement *"for nonpunitive reasons."*

*Id.* at 80 (quoting *Hewitt v. Helms,* 459 U.S. at 460, 103 S.Ct. at 864) (emphasis added). Of course, the *Sher* court also acknowledged that the liberty interest recognized in *Wolff v. McDonnell* had been grounded in the substantive protection accorded by state law. Although several circuits have since concluded that restrictive confinement imposed for disciplinary purposes impairs a liberty interest only if that interest is substantively protected under state law, *see, e.g., Parenti v. Ponte,* 727 F.2d 21 (1st Cir.1984); *Dudley v. Stewart,* 724 F.2d 1493 (11th Cir.1984); *McCrae v. Hankins,* 720 F.2d 863 (5th Cir.1983), I have been unable to find a single case holding that a state law fails to afford such protection.

tionally valid basis. *See id.* at 82 (citing *Mt. Healthy City Bd. of Ed. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). New York law (like the Illinois statute at issue here) circumscribed official power to impose punishment but allowed prison officials free rein to segregate prisoners for nonpunitive reasons. In the same manner as Judge Sneed in the instant case, therefore, the Second Circuit ruled that Sher's restrictive confinement in the Reclassification Unit at Attica did not impair any protected liberty interest because it was performed for administrative reasons.

*Casteneda v. Henman,* 914 F.2d 981 (7th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 1085, 112 L.Ed.2d 1190 (1991), does not depart from this long line of precedent. It is, on the contrary, completely consistent with *Sher.* In *Castaneda,* no protected liberty interest was impaired because the case involved an interprison transfer where no statute or prison regulation placed substantive limits upon prison officials' discretion. It is, therefore, directly controlled by *Montanye,* 427 U.S. 236, 96 S.Ct. 2543.[5]

The majority's approach presents basic problems of fundamental fairness. The danger inherent in the majority's analysis may be illustrated by a hypothetical. Assume that two prisoners—Prisoner *A* and Prisoner *B*—are incarcerated in the same cell. The prison guard, who harbors an intense antipathy for *B,* discovers a secret stash of heroin carefully hidden in their joint cell. Hastily concluding in his broad discretion that *B* is guilty of violating the prison rule against drug possession, the guard ships *B* off to solitary confinement for a period of two years. State law resembles the Illinois regulations at issue here: read narrowly (as the majority would read these regulations), it creates no liberty interest in freedom from disciplinary segregation because it permits confinement even

for tenuous administrative reasons. The Eighth Amendment is equally of no avail to *B* because two years in solitary confinement is not disproportionate to the serious offense for which he was imprisoned. *Cf. Montanye,* 427 U.S. at 242, 96 S.Ct. at 2547 (as long as "the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not by itself subject an inmate's treatment by prison authorities to judicial oversight"). Although *A* is in fact the guilty party, *B* has been afforded no chance to prove his innocence—he has been denied notice and the opportunity to be heard before an impartial tribunal.

The majority overlooks the disturbing consequences of its rule that state statutes circumscribing the administration of punishment (whether in the form of a job deprivation or disciplinary segregation) create no liberty interest unless prisoners are entitled to the underlying right (to a job or incarceration among the general population). The majority's approach disregards precedent. But, even more fundamentally, the majority's analysis contravenes the widely-held intuition basic to our society that punishment should not be imposed for misconduct without a prior determination of guilt. Long ago, the Supreme Court promised that "a prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime. There is no iron curtain drawn between the Constitution and the prisons of this country." *Wolff v. McDonnell,* 418 U.S. at 555–56, 94 S.Ct. at 2974. Because the broad potential scope of today's decision robs this promise of its substance, I respectfully dissent.

---

**5.** Detailed study of these cases demonstrates that the courts have been hesitant to find substantive conditions in prison regulations dealing with interprison transfers but have easily discovered such conditions in statutes regulating segregation within a particular prison. *Cf. Castaneda,* 914 F.2d at 986–87 (Will, J., concurring). Perhaps this disparity is attributable to judicial deference to *Montanye.* Or it may be the result of an implicit judicial balance struck between the need for institutional flexibility and the severity of certain types of deprivations. Or perhaps it simply reflects the fact that interprison transfers frequently are based upon a complex of motives while commitment to institutional segregation may be more openly and purely punitive.