Diane M. WILSON, Plaintiff–Appellee,

v.

Ugo FORMIGONI, Carlos Deeb and Bruce Wilosinski, Defendants–Appellants.

No. 93–3131.

United States Court of Appeals, Seventh Circuit.

Argued May 19, 1994.

Decided Dec. 14, 1994.

Patrick J. Cullinan (argued), Smith, Williams & Lodge, Chicago, IL, for plaintiff-appellee.

Roland W. Burris, Alison O'Hara (argued), Rita M. Novak, Office of the Atty. Gen., Chicago, IL, for defendants-appellants.

Before SPROUSE,* COFFEY and KANNE, Circuit Judges.

* The Honorable James M. Sprouse, Circuit Judge of the United States Court of Appeals for the Fourth Circuit, sitting by designation.

COFFEY, Circuit Judge.

Diane M. Wilson, a patient at the Madden Mental Health Center ("Madden") operated by the state of Illinois in Hines, Illinois, brought this suit under 42 U.S.C. § 1983 against the facility's director, her treating psychiatrist and social worker. She alleged that the defendants violated her substantive and procedural due process rights under the Fourteenth Amendment by failing to provide her with reasonably safe conditions of confinement and by failing to initiate involuntary commitment proceedings. She also raised several pendent state tort claims. 28 U.S.C. § 1367. The defendants moved to dismiss the complaint, claiming, among other things, that Wilson's due process claims were barred by qualified immunity. Fed.R.Civ.P. 12(b)(6). The district court granted the motion to dismiss with respect to the substantive due process claim, but denied the defendants' qualified immunity defense as to the procedural due process claim. 832 F.Supp. 1152. The defendants appeal only the district court's denial of their motion to dismiss the plaintiff's procedural due process claim on qualified immunity grounds. We have jurisdiction under the collateral order doctrine. *See Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 2817–18, 86 L.Ed.2d 411 (1985); 28 U.S.C. § 1291. We reverse holding that Wilson has failed to meet the threshold burden of asserting a violation of a constitutional right.

## I. Background

■ For purposes of reviewing a denial of a Rule 12(b)(6) motion, we accept the factual allegations of the complaint as true. *Zinermon v. Burch,* 494 U.S. 113, 118, 110 S.Ct. 975, 979, 108 L.Ed.2d 100 (1990); *Dawson v. General Motors Corp.,* 977 F.2d 369, 372 (7th Cir.1992). Wilson's complaint provides the following factual background. Wilson suffers from a schizophrenic disorder, and her condition has been determined as presenting a danger to herself and others. She is easily agitated and has attacked other patients in the facility. Since 1984, Wilson has been a patient in a number of mental health institutions including Madden, and her psychiatric episodes have been documented in the respective institutions. While confined at Madden, Wilson was observed and treated by defendant psychiatrist Carlos Deeb and other Madden staff. As late as 1992, Dr. Deeb opined Wilson's mental illness to be severe. Also documented in the record at Madden were Wilson's repeated attempts to commit suicide as well as her history of being AWOL from the mental health facilities and aftercare homes and placing herself in circumstances of danger. On occasion, she has been found walking down the middle of an interstate highway, or sleeping on an interstate highway, and on another occasion, attempting to get into the vehicle of unknown and armed strangers—she has a tendency to take up with strangers and hitchhike to other states.

In July 1990, Wilson was detained by the police and thereafter was brought to Madden pursuant to a petition for involuntary/judicial admission. Attached to the petition was a physician's certificate stating that Wilson was unable to care for herself and that she suffered from homicidal as well as suicidal tendencies, and recommending that Wilson be involuntarily committed.[1] Madden's staff persuaded Wilson to sign an application for voluntary admission, and informed her that as a general rule patients in her situation do not lose any of their legal rights, benefits or privileges simply because they are admitted to a mental health facility.[2] An intake as-

---

1. Under Illinois law, "no person shall be admitted to a state-operated mental health facility until a written statement ... recommending admission has been obtained from a qualified certifier...." 405 ILCS 5/3–601. The statement must indicate "whether (i) the respondent is appropriate for admission to a State-operated mental health facility, (ii) what alternative treatment settings were considered, and (iii) if admission to a State-operated facility is recommended, why alternative treatment was not considered appropriate." 405 ILCS 5/3–601.1.

2. The record is unclear as to whether the staff was referring to voluntarily or involuntarily committed patients when they indicated to Wilson that mental health patients do not lose any legal rights upon admission to the mental health facility. The distinction may not be important, however, because under Illinois law, persons receiving mental health care or treatment from the state do not lose any of their legal rights on account of their receipt of the care or treatment. 405 ILCS 5/2–100 provides:

sessment at the time of Wilson's admission noted that Wilson exhibited a markedly impaired attention span, lacked decision making abilities, as well as appearing to be delusional. A psychiatric evaluation of Wilson prepared around the same time opined that Wilson was only partially oriented, and that her thought process was fragmented.

Wilson remained at Madden for approximately two months and was transferred to the University of Chicago Hospital for further diagnostic testing and evaluation. She was returned to Madden three weeks later again pursuant to a petition, prepared by the University of Chicago Hospital medical staff, recommending her involuntary/judicial admission. A certificate attached to the petition stated, among other things, that Wilson required long-term psychiatric care to protect her from serious harm. Madden's staff again persuaded Wilson to sign an application for voluntary admission or commitment.

While Wilson was confined at Madden, there were times when Wilson's freedom of movement was restricted without her consent. At times she was confined to her unit, or placed in segregation as well as placed in full leather restraints. Between July 1990 and November 1991, Wilson made nine written requests to be released from Madden. On each occasion the staff at Madden was able to persuade Wilson to withdraw her request. On one occasion when Wilson refused to rescind her request, the staff prepared and filed a petition with the court for involuntary admission. Prior to the hearing on this petition, however, Wilson withdrew the request again due to the staff's power of persuasion. During this period, Wilson made several oral requests for release which were ignored.

Between November 1991 and February 1992, there were five instances of Wilson leaving the facility without authorization or supervision. On one of the occasions she was found at O'Hare Airport and returned by the police. Another time, she was issued a grounds pass to the canteen but failed to

return as instructed. She was later returned by a member of the clergy from Madden. Twice, Wilson voluntarily returned to Madden after an unauthorized absence or sometime after the expiration of her grounds pass. On March 3, 1992, Wilson attended a group therapy session in a building separate from where she was housed. The nurse in charge sent a note to the group therapy leader requesting him or her to call the nurse before Wilson left the session in order that Wilson could be escorted back to her unit. Either because the note was never delivered to the group therapy leader or the leader failed to follow the instruction, Wilson left the building and the premises without an escort at approximately 8 p.m. She was found approximately four hours later severely injured and unconscious more than five miles away from Madden. The injuries caused Wilson to be hospitalized for two months, and her psychiatric condition has continued to deteriorate since that episode. Wilson was adjudicated legally disabled by the Circuit Court of Cook County in April 1992, *Estate of Diane M. Wilson,* 92 P 2625, Dckt. 241, Pg. 145 (April 21, 1992), and presumably is now involuntarily committed as a mental health patient at Madden.

In her § 1983 action against the defendants, Wilson alleged in Count I that the defendants violated her substantive due process rights by failing to take effective measures to restrain her or prevent her from leaving the facility without supervision and by acting with reckless disregard of her rights to reasonably safe conditions of confinement. Count II alleged that the defendants violated Wilson's procedural due process rights by failing to initiate the involuntary commitment proceedings pursuant to the state's Mental Health and Developmental Disabilities Code ("Mental Health Code"), even though they knew that Wilson was incompetent to give informed consent to voluntary admission. *See* 405 ILCS 5/3–700 *et seq.* It further alleged that although the defendants were aware of Wilson's repeated instances of leaving the facility without au-

---

§ 2–100(a) No recipient of services [under the Mental Health Code] shall be deprived of any rights benefits, or privileges guaranteed by law, the Constitution of the State of Illinois, or the Constitution of the United States solely on account of the receipt of such services. The term "services" is defined as treatment or habilitation. 405 ILCS 5/1–115.

thorization or supervision and her markedly impaired ability to care for herself, they merely persuaded Wilson to withdraw her requests to be released instead of initiating involuntary placement proceedings as Wilson argues is required by the Illinois Mental Health Code. *See* 405 ILCS 5/3–403. Counts III through V asserted pendent state law negligence claims against the three defendants individually.

The district court granted the defendants' motion to dismiss on qualified immunity grounds with respect to Count I. The court acknowledged that Wilson's complaint sufficiently alleged that she was a de facto involuntary patient, and that an involuntarily committed mental patient's right to reasonably safe conditions of confinement was established by *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). The court found, however, that it was not clearly established that *Youngberg* applied to those voluntary patients who were in reality committed involuntarily. The district court noted that since the Supreme Court's decision in *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), which held that one has no due process right to safety unless the state had taken an affirmative action to deprive him of his liberty, courts have frequently denied voluntarily committed patients' substantive due process claims. As to Wilson's procedural due process claim, however, the district court found that the defendants were not entitled to qualified immunity. Relying on *Zinermon v. Burch*, 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990), the district court found that Wilson has alleged a deprivation of a clearly established constitutional right of which a reasonable person would have known. The defendants appeal from that decision.

## II. Analysis

■ We review the district court's decision to deny a qualified immunity defense *de novo*. *Pounds v. Griepenstroh*, 970 F.2d 338, 339 (7th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1256, 122 L.Ed.2d 654 (1993); *Maust v. Headley*, 959 F.2d 644, 649 (7th Cir.1992). Because the immunity defense is raised in a motion to dismiss under Rule 12(b)(6), we must accept as true the well-pleaded allegations of the complaint and the inferences that may be reasonably drawn from those allegations. *Triad Associates, Inc. v. Robinson*, 10 F.3d 492, 495 (7th Cir. 1993); *McMath v. City of Gary*, 976 F.2d 1026, 1031 (7th Cir.1992).

■ The doctrine of immunity, whether absolute or qualified, "spare[s] a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn out lawsuit." *Siegert v. Gilley*, 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). Under the doctrine of qualified immunity, government officials performing discretionary functions are shielded from liability for civil damages if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). But before we even reach the immunity claim, the plaintiff's complaint must state a claim on which relief may be granted. As the Supreme Court emphasized in *Siegert v. Gilley*, "[a] necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all." 500 U.S. at 232, 111 S.Ct. at 1793; *see also Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir.1994).

■ Thus, where the affirmative defense of qualified immunity is properly raised, this court has used a two-step analysis: (1) Does the alleged conduct set out a constitutional violation? and (2) Were the constitutional standards clearly established at the time in question. *Id.; Zorzi v. Putnam*, 30 F.3d 885, 892 (7th Cir.1994); *see also Pounds*, 970 F.2d at 340. The first part of this test "is a threshold issue" that can defeat entirely the plaintiff's claim. *Zorzi*, 30 F.3d at 892 (citing *Marshall v. Allen*, 984 F.2d 787, 793 (7th Cir.1993)). If a plaintiff's allegations, even when accepted as true, do not state a cognizable violation of a constitutional right, then the defendant is entitled to

qualified immunity. *Id.* As the Supreme Court notes, "[d]ecision of this purely legal question permits courts expeditiously to weed out suits which fail the test without requiring a defendant who rightly claims qualified immunity to engage in expensive and time consuming preparation to defend the suit on its merits." *Siegert,* 500 U.S. at 232, 111 S.Ct. at 1793; *see also Donovan,* 17 F.3d at 947; *Triad Associates, Inc.,* 10 F.3d at 496. Similarly, a court confronting a procedural due process claim must initially determine whether the government deprived a person of a protected life, liberty, or property interest as a matter of substantive law, and, only if the answer is positive will the court reach the question of whether the deprivation took place without the process that was due. *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487, 1492, 84 L.Ed.2d 494 (1985); *Fittshur v. Village of Menomonee Falls,* 31 F.3d 1401, 1405 (7th Cir.1994).

In this case, after reading the complaint, we are of the opinion that Wilson has failed to meet her threshold burden of stating a violation of a constitutional right; she does not allege the deprivation of a cognizable liberty or property interest for which due process protections are required. The Fourteenth and the Fifth Amendment limit the state's power to curtail liberty—the due process clause forbids a state to deprive a person of life, liberty, or property without due process of law. *Smith v. Shettle,* 946 F.2d 1250, 1252 (7th Cir.1991). A person has a "liberty interest in avoiding confinement in a mental hospital," *Zinermon v. Burch,* 494 U.S. 113, 131, 110 S.Ct. 975, 986, 108 L.Ed.2d 100 (1990), and thus the involuntary commitment of a person constitutes a deprivation of liberty that requires due process protection. *Vitek v. Jones,* 445 U.S. 480, 491–92, 100 S.Ct. 1254, 1263, 63 L.Ed.2d 552 (1980) (commitment to mental hospital entails "a massive curtailment of liberty," and requires due process protection); *Parham v. J.R.,* 442 U.S. 584, 600, 99 S.Ct. 2493, 2503, 61 L.Ed.2d 101 (1979); *Addington v. Texas,* 441 U.S. 418, 425, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323 (1979) ("[C]ivil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection");

*O'Connor v. Donaldson,* 422 U.S. 563, 576, 95 S.Ct. 2486, 2494, 45 L.Ed.2d 396 (1975); *see also Jones v. United States,* 463 U.S. 354, 361, 103 S.Ct. 3043, 3048, 77 L.Ed.2d 694 (1983).

But Wilson does not argue that she was deprived of her right to be free from confinement in a mental health facility. Rather, her complaint reflects her belief that she should have been involuntarily committed and that the defendants' failure to so commit her and thus curtail her liberty caused her to suffer physical harm. For instance, she asserts in the complaint that her mental condition "requires long term in patient treatment," and complains that the defendants did not sufficiently curtail her movement at Madden. She faults the defendants for failing to confine her in a locked down unit or to restrain her movements "in any other such manner so as to prevent her from leaving the facility on her own." She further faults the defendants for failing to "institute any measures for Madden staff to follow to insure [sic] that [she] would not be allowed outside the buildings of Madden without supervision." Finally, Wilson alleges that as a result of the defendants' failure to curtail her movement, she "suffered severe and multiple injuries including but not limited to facial fractures, inflammation of the brain, and damage to the orbit of her left eye."

Wilson's complaint makes it clear that she does not claim to have been injured because she was confined against her will without due process. To the contrary, her injury was the physical trauma she allegedly suffered due to the defendants' failure to involuntarily commit her and thus prevent her from leaving the confined quarters of Madden without supervision or to confine her in a locked down unit at the mental health institution. She argues that by failing to initiate the involuntary commitment procedures and commit her as an involuntary patient, the defendants deprived her of the substantive due process protections of reasonably safe conditions of confinement accorded to involuntarily committed mental patients under *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). In essence, Wilson argues that she has a right to be involuntarily

committed stemming from the state's obligation to commit one who is unable to care for herself or himself, and that she was deprived of that right without due process of law.

 The fallacy of Wilson's position is her belief that she has a right to be involuntarily committed and *deprived* of her liberty. But there is no constitutional right to be deprived of liberty—there is no right to be imprisoned, and none to be involuntarily committed in a mental health facility. Nor does the involuntary commitment procedures provided by the Illinois Mental Health Code, 405 ILCS 5/3–400 *et seq.,* create in Wilson an entitlement to involuntary commitment. It is true that state law can be a source of substantive entitlements to property and liberty that the due process clause protects. *Villanova v. Abrams,* 972 F.2d 792, 798 (7th Cir. 1992); *Smith,* 946 F.2d at 1254. However, state-created procedural requirements do not, standing alone, constitute protected liberty or property interests or create substantive entitlements. *Olim v. Wakinekona,* 461 U.S. 238, 250, 103 S.Ct. 1741, 1748, 75 L.Ed.2d 813 (1983); *Villanova,* 972 F.2d at 798; *Maust,* 959 F.2d at 648–49; *Smith,* 946 F.2d at 1254. We have cautioned that "process is not an end in itself ... [i]ts constitutional purpose is to protect a substantive interest to which the individual has a claim of entitlement." *Maust,* 959 F.2d at 648–49 (quoting *Doe v. Milwaukee County,* 903 F.2d 499, 502–03 (7th Cir.1990)).

 The Illinois Mental Health Code does not provide that a mentally ill patient has a right to be involuntarily committed in a mental health facility. On the contrary, it creates a liberty interest in being free from confinement—it prevents the state from involuntarily admitting a person who is not a danger to herself or others.[3] 405 ILCS 5/1–119; *Villanova,* 972 F.2d at 798. Just as there is no general right to welfare, *see Goldberg v. Kelly,* 397 U.S. 254, 261–62, 90

S.Ct. 1011, 1016–17, 25 L.Ed.2d 287 (1970) ("[welfare] benefits are a matter of statutory entitlement"), there is no general right to be involuntarily committed as a result of an alleged mental illness. Because Wilson does not have a "legitimate claim of entitlement" to involuntary commitment, *see Wallace v. Robinson,* 940 F.2d 243, 246–47 (7th Cir. 1991) (en banc), *cert. denied,* —— U.S. ——, 112 S.Ct. 1563, 118 L.Ed.2d 210 (1992), there can be no deprivation of Wilson's substantive right that would implicate any procedural due process concerns. Wilson's physical injuries were not incurred as a result of a violation of constitutional rights. Accordingly, Wilson's procedural due process claim fails at the outset.

Wilson's reliance on *Zinermon v. Burch,* 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990) is misplaced. In *Zinermon,* a former patient of a state mental health facility brought suit against the physicians, administrators, and staff members at the hospital, after being confined in the facility for five months. The plaintiff alleged that the defendants deprived him of his liberty, without due process of law, by admitting him as a "voluntary" mental patient when they knew or should have known that he was incompetent to give informed consent to his admission. 494 U.S. at 115, 110 S.Ct. at 977–78. Moreover, the plaintiff alleged that during the five months he was confined there he was never given a hearing regarding his hospitalization and treatment. He contended that the defendants should have afforded him the safeguards of the state involuntary placement procedures before his involuntary commitment, and that their failure to do so violated his procedural due process rights. *Id.* The Supreme Court held that the plaintiff had stated a claim for a procedural due process violation.

Unlike the case at bar, the sole issue in *Zinermon*—the issue with respect to which the Supreme Court granted certiorari—was the application of the *Parratt* rule, as set out

---

**3.** § 1–119 of the Illinois Mental Health & Developmental Disabilities Code provides:

"Person subject to involuntary admission" or "subject to involuntary admission" means:

(1) A person with mental illness and who because of his or her illness is reasonably expect-

ed to inflict serious physical harm upon himself or herself or another in the near future; or

(2) A person with mental illness and who because of his or her illness is unable to provide for his basic physical needs so as to guard himself or herself from serious harm....

in *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) and modified by *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). The only question was whether the *Parratt* rule necessarily meant that the plaintiff's complaint failed to allege any deprivation of due process, because he was constitutionally entitled to nothing more than what he had received—an opportunity to sue the defendants in tort for his allegedly unlawful confinement. *Zinermon,* 494 U.S. at 117, 110 S.Ct. at 979. In fact, the Court expressly refrained from ruling on the merits of the plaintiff's claim. *See id.*

More importantly, unlike Wilson who does not challenge the fact of her confinement in a mental hospital but complains that she should have been confined in a more restricted mental health care environment, the plaintiff in *Zinermon* complained that he was not given the required timely due process hearing to guard against the danger of being confined indefinitely. It was not disputed in *Zinermon* that the liberty interest at stake was the plaintiff's right in "avoiding confinement in a mental hospital without either informed consent or the procedural safeguards of the involuntary placement process." *Id.* at 131, 110 S.Ct. at 986. As the Court noted, the plaintiff's confinement at the facility for five months "without a hearing or any other procedure to determine either that he validly had consented to admission, or that he met the statutory standard for involuntary placement, clearly infringes on this liberty interest." *Id.*

Wilson, on the other hand, does not point to any cognizable liberty interest or substantive entitlement. As mentioned before, Wilson does not complain about her commitment in a mental hospital; her allegations plainly reflect that the interest for which she seeks due process protection is not her freedom. She does not request a hearing to determine whether she was held there against her will. What she really seeks is the right to require the state to involuntarily commit her in order that it might ensure her safety and well-being. The due process clause does not give her that right. As the Supreme Court recognized,

[t]he Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.

*DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 195, 109 S.Ct. 998, 1003, 103 L.Ed.2d 249 (1989). Wilson does not complain that she was held at Madden against her will, and thus cannot maintain that the state did not do enough to ensure her safety while she was committed there. *See Collins v. Harker Heights,* 503 U.S. 115, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992) (holding that the due process clause does not require the state to furnish its labor force with a safe work environment; where employee voluntarily accepted state's employment offer, there was no deprivation of liberty to implicate the Constitutional guarantee of "process" which includes "a continuing obligation to satisfy certain minimal custodial standards"). Wilson's procedural due process claim is nothing more than a restatement of her substantive due process claim which was rejected by the district court on qualified immunity grounds.

### III. Conclusion

The judgment of the district court denying the defendants' motion to dismiss Wilson's procedural due process claim is REVERSED, and this case is REMANDED to the district court for further proceedings consistent with this opinion.