Bruce T. MURSCH, Plaintiff–Appellant,

v.

VAN DORN COMPANY, d/b/a Central States Can Company, Defendant–Appellee.

Nos. 87–1254, 87–1519.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 4, 1987.

Decided July 13, 1988.

Carlo Balistrieri, Balistrieri & Wagner, Whitewater, Wis., for plaintiff-appellant.

Susan R. Maisa, Foley & Lardner, Milwaukee, Wis., for defendant-appellee.

Before CUDAHY and COFFEY, Circuit Judges, and NOLAND, Senior District Judge.*

* The Honorable James E. Noland, Senior District Judge for the Southern District of Indiana, sit-

COFFEY, Circuit Judge.

Plaintiff-appellant Bruce Mursch appeals the district court's grant of summary judgment in favor of the defendant-appellee on Mursch's claim for breach of an employment contract. We affirm.

## I.

In May 1981, the defendant-appellee Van Dorn Company, d/b/a Central States Can Company ("Central States") hired Mursch as a salesman. According to Mursch's immediate supervisor, Paul Weston, Central States did not agree to employ Mursch for any specified period of time. During his employment with Central States (from May 1981 until March 1984), Mursch's compensation consisted of a salary and profit-sharing payments; he neither received a commission for sales nor did Central States' compensation plan provide for bonus payments.

On his first day of work, Mursch was given a copy of Central States' employment manual. The section of the handbook entitled "Standards We Go By" reads as follows:

"At Central States, as in every segment of society, we have found that there are certain conduct *guidelines* necessary to provide standards by which we are all guided. For example, a serious fire could put us all out of work. Carelessness and poor work by a few could lose customers and work for all of us. Our employees are responsible adults and are treated as such. However, for the few that need some *guidelines*, the following items are listed to help you know when and where, disciplinary action will be taken. It is our practice to approach the matter of discipline by trying to correct those who have difficulty understanding or following our *guidelines*. Conduct inconsistent with the following *guidelines* or with generally accepted plant practices, *may* be cause for

ting by designation.

disciplinary action up to and including termination of your employment.

1. Theft.

2. Refusing to carry out an instruction from a responsible supervisor.

3. Knowingly producing unsatisfactory work.

4. Abusing or destroying company equipment or property.

5. Unsatisfactory attendance.

6. Drinking or being under the influence of any alcoholic beverage on company property at any time.

7. Using, or being under the influence of, or sale of, any illegal drug or narcotic.

8. Immoral conduct or indecency.

9. Horseplay, fighting or possession of a dangerous weapon on company premises.

10. Unsatisfactory work performance.

The above *guidelines* add up to common sense behavior which is expected of all of us, both at work and elsewhere. They are subject to change as may become necessary; however, we shall strive to keep this list of standards at a minimum."

(Emphasis added). Mursch testified that the only thing he specifically remembers being told when he received the handbook is that the handbook contained everything concerning employee relations, including the company's insurance and profit-sharing programs. Mursch stated that he read the manual the day he received it and thereafter referred to it when he had questions about company policy.

Mursch also testified that at a lunch meeting during his first week of employment, John Howington, Central States' Vice–President of Sales, made a statement to him concerning Mursch's length of employment:

"[H]e [John Howington] was again telling me about how great it was to work for Central States Can and that they had no mandatory retirement and so long as you do your job you can be here until you're a hundred."

Mursch recites that he recalls no other statements being made to him by company representatives regarding his length of employment.

Mursch was under the supervision of Paul Weston for his entire period of employment with Central States. Weston was the company's Director of Sales at the time Mursch's employment commenced and held that position until March 1, 1984, when he was elevated to the position of Vice–President of Marketing and Sales.

On a number of occasions during Mursch's term of employment, Weston informed Mursch that certain aspects of his performance were unsatisfactory, including the infrequency of sales calls, excessive use of cash, unreceipted expenditures, over-budget expenses as well as unsatisfactory sales ability. Nevertheless, according to Mursch's calculations, he was Central States' number one saleman and during his three-year period of employment he doubled not only his sales but also his customer base.[1]

On March 22, 1984, Weston notified Mursch that Central States had decided to terminate his employment. Weston testified that the reasons for Mursch's termination were as follows:

"(1) He was not a team player and that he was sometimes uncooperative, antagonistic and seemingly more interested in his own situation than in the success of Central States and Co.;

(2) I was not pleased with his performance because he did not have a sense of urgency, he was not creative or imaginative, and I was not pleased with the level or depth of his selling;

(3) Complaints were received from customers relating to his personality, lack of attention and not being able to get hold of him;

(4) Customers did not seem to call him when problems arose;  and

---

1. Mursch calculated these figures on the basis of data obtained from computer charts setting out monthly and year-to-date sales figures for all company salesmen.

(5) He 'ticked off' many people at the company."

June 25, 1984, was Mursch's last day of work with Central States.

Subsequently, Mursch commenced this action against Central States in the Jefferson County, Wisconsin Circuit Court alleging: (1) age discrimination under the Wisconsin Fair Employment Act (WFEA); (2) wrongful discharge in violation of Wisconsin public policy; and (3) breach of contract based on the employee handbook and an alleged oral promise. After Central States removed the lawsuit to federal district court on the basis of diversity of citizenship, the company filed a motion to dismiss Mursch's complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). The trial court dismissed Mursch's state age discrimination and wrongful discharge claims on the ground that the former was preempted by the administrative remedies contained in the WFEA, and the latter precluded by the plaintiff's failure to exhaust those remedies.

Thereafter, Central States filed a motion for summary judgment with respect to Mursch's remaining breach of contract claim. The district court granted the motion, finding that: (1) the language of the employment manual issued to Mursch "does not establish conditions of employment that would convert plaintiff's employment into an enforceable contractual relationship," and (2) John Howington's statement to Mursch failed to create an enforceable contract of employment between Mursch and the company. The court entered judgment in favor of Central States on February 3, 1987, 627 F.Supp. 1310, and subsequently denied Mursch's motion to reconsider the entry of summary judgment. Mursch appeals the trial court's order entering summary judgment in favor of Central States on Mursch's breach of contract claim.

## II.

■ Mursch maintains that Central States' issuance of an employee handbook to him at the commencement of his employment, combined with Howington's (Central States' Vice President of Sales) oral statements concerning the length of Mursch's employment, created contractual limits on the company's right to terminate his employment. Because federal court jurisdiction is premised upon diversity of citizenship, 28 U.S.C. § 1332, we consider each theory of contract formation separately under Wisconsin law, the forum in which the district court sits. *Erie R.R. v. Tompkins,* 304 U.S. 64, 71–80, 58 S.Ct. 817, 818–23, 82 L.Ed. 1188 (1938). In analyzing the factual basis for Mursch's claims, we note that the trial court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Federal Rule of Civil Procedure 56(c). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

With respect to Mursch's initial theory of contract formation, Mursch argues that the express terms of the Central States employee handbook altered the parties' common law "at will" employment relationship recognized in Wisconsin,[2] and created an express contract of employment between Mursch and Central States. Under the law of Wisconsin, a wrongful discharge of an employee at will occurs only when "the discharge is contrary to a fundamental and well-defined public policy ... evidenced by a constitutional or statutory provision." *Brockmeyer v. Dun & Bradstreet,* 113 Wis.2d 561, 573, 335 N.W.2d 834, 840

**2.** A number of articles trace the history of the common law employment at will doctrine from Horace G. Wood's influential treatise on master and servant law in 1877 to the modern formulations of the doctrine. *See, e.g.,* Note, *Bushko v. Miller Brewing Co.: An Analysis of the Wisconsin Public Policy Exception to the Employment at* *Will Rule and a Call for Legislative Action,* 1987 Wis.L.Rev. 689; Finkin, *The Bureaucratization of Work: Employer Policies and Contract Law,* 1986 Wis.L.Rev. 733; Note, *Protecting at Will Employees Against Wrongful Discharge: The Duty to Terminate only in Good Faith,* 93 Harv. L.Rev. 1816 (1980).

(1983). Thus, absent the parties' express abrogation of an employee's "at will" status, employees in Wisconsin are "dischargeable at the whim of the employer, subject to the unusual public policy considerations that may occasionally arise and which were explained in *Brockmeyer....*" *Ferraro v. Koelsch*, 124 Wis.2d 154, 165, 368 N.W.2d 666 (1985). *See also Koehn v. Pabst Brewing Co.*, 763 F.2d 865, 865 (7th Cir.1985); *Kumpf v. Steinhaus*, 779 F.2d 1323, 1326 (7th Cir.1985). Mursch contends that the Central States handbook contained promises modifying his contractual relationship with Central States from one that is terminable at will to one of express contract.

While we agree that "[e]mployee handbooks may be express contracts of employment in Wisconsin," *Shaver v. Woolworth Co.*, 840 F.2d 1361, 1370 (7th Cir.1988) (dissenting opinion) (citing *Ferraro* ), the Wisconsin Supreme Court in *Ferraro* has held that in light of the state's policy favoring employment at will, "it would not by implication *alone* convert a handbook produced by an employer for guidance and orientation of employees into an express contract." 124 Wis.2d at 166, 368 N.W.2d 666 (emphasis in original). Rather, the court held that the particular handbook in question and the particular factual situation must be analyzed to determine whether the parties had manifested "an express intent to bind one another in a relationship that was not an at will employment contract." *Id.* at 168, 368 N.W.2d 666. Hence, under *Ferraro* an employment manual may only alter an employee's "at will employment" relationship if the manual contains express provisions from which the trier of fact may reasonably infer that the parties intended to bind each other to a different relationship.

In determining what handbook provisions provide credible evidence of the parties' intent to enter into a contract for something other than an employment contract

terminable at will, it is necessary that we compare the *Ferraro* handbook with the Central States employment manual. In *Ferraro*, the plaintiff received a 48–page handbook from his employer entitled "Hyatt Regency–Milwaukee Employee's Handbook."[3] The handbook contained the following policy statements (the italicized portions highlight the mandatory language contained in the Hyatt handbook):

*"Disciplinary Action*

In order for HYATT to maintain a desirable level of employee conduct and productivity, HYATT policies must be enforced. HYATT *policy requires that employees not be dismissed or laid-off without just cause.* However, should an employee violate a HYATT rule or policy, including those rules set forth by each department, disciplinary action may be necessary and the following steps *will be taken:*

1. A *verbal warning* may be given as an initial indication of lack of satisfaction with work performance, or for the *first* violation of an established HYATT rule or policy.

2. If the employee fails to correct his/her poor performance, or commits an additional violation of an established HYATT rule or policy, a *written warning* will be issued.

3. In general, 2 prior warnings for similar offenses should be given before an employee is dismissed or suspended.

4. The purpose of a suspension is to give the employee the opportunity to think about whether he/she wants to follow HYATT rules or find another job. The suspension period will depend upon the seriousness of the offense.

5. When an employee continues to violate a HYATT rule or policy, or fails to improve his/her job performance, it may become necessary to dismiss him/her.

In the case of a severe rule violation, dismissal may be without prior warnings.

---

**3.** In *Ferraro*, the exact date Ferraro received the handbook was disputed. Ferraro testified that he received the handbook in May of 1980, but the date he affixed his signature to the acknowledgement was August 6, 1980. Nevertheless, in

footnote 2 of the decision, the court deemed it irrelevant whether Ferraro received the handbook in May or in August, as both dates preceded the facts which gave rise to the lawsuit.

*HYATT policy requires an investigation prior to dismissal.*

### Just Causes for Dismissal

The following rules are EXTREMELY IMPORTANT and should be reviewed carefully by each employee. The violation of these rules will be considered sufficient cause for immediate dismissal.

. . . .

6. Disrespectful conduct. Gambling or fighting on hotel premises; coercion, intimidation or threats of any kind against guests, supervisors or fellow employees; using vulgarity or failing to give a high degree of service and courtesy to any guest; soliciting gratuities from guests or commenting in any way as to the amount of gratuity given.

. . . .

*. . . if we must layoff any employees, it will be based on your seniority* within your job classification in the department you are currently working in.

Those employees who are still within their probationary period can be separated from their employment at the hotel immediately for conduct deemed undesirable.

Normally a two-week notice is expected unless other arrangements have been made with your supervisor. Leaving without notice may affect your work record with us."

124 Wis.2d at 159–60, 368 N.W.2d at 669 (emphasis added).

Examining these provisions, the Wisconsin Supreme Court found that the seniority layoff provision, in conjunction with Hyatt's policy of dismissal for just cause (and then only after two warnings are given), manifested the parties' intent to place a contractual limitation on their at-will relationship:

"That this was an abrogation of an at-will relationship, if such were originally intended, is clear from the language of the handbook. For example, the [employer] promised that, in the event of layoffs, any layoff 'will be based on your seniority.' . . . Hyatt in its contract bound itself to discharge only for 'just cause,' and then only after two warnings

had been given—except in cases of severe rule violations, and in any case only after investigation."

124 Wis.2d at 165, 170, 368 N.W.2d 666. Based upon these express contractual undertakings, the court concluded:

"As pointed out above, the handbook, whose conditions were accepted, set up a hierarchy of rules the infraction of which could lead to discharge, with the promise that an employee would be *entitled* to different treatment depending upon the type of alleged misconduct and, most importantly, that a discharge would only be for 'just cause.' . . . [W]hatever the original relationship between the parties— and it is apparent that if no other evidence were available than that in the original application for employment, the relationship would be 'at will'—the promises in the handbook, coupled with the return promises of the employee Ferraro, resulted in an express contract incorporating all the provisions thought desirable by the employer in respect to obligations of the employee, misconduct, and employee discipline and discharge."

*Id.* at 165, 167, 368 N.W.2d 666 (emphasis in original).

Unlike the *Ferraro* handbook, the Central States manual contains neither a just cause provision nor a contractual guarantee that layoffs will be based on a employee's seniority. In contrast to the repeated mandatory and unambiguous language in the Hyatt handbook (e.g. layoffs based exclusively on seniority—written warnings required), the provisions of Mursch's employment manual are expressly denominated as "guidelines" and are couched in permissive language. As an example, the section of the Central States manual entitled "Standards We Go By" underscores the at-will nature of the parties' relationship. In fact, that section repeats five separate times that the handbook merely contains *guidelines*, not express contractual undertakings:

"At Central States, as in every segment of society, we have found that there are certain conduct *guidelines* necessary to provide standards by which we

are all guided. For example, a serious fire could put us all out of work. Carelessness and poor work by a few could lose customers and work for all of us. Our employees are responsible adults and are treated as such. However, for the few that need some *guidelines*, the following items are listed to help you know when and where, disciplinary action will be taken. It is our practice to approach the matter of discipline by trying to correct those who have difficulty understanding or following our *guidelines*. Conduct inconsistent with the following *guidelines* or with generally accepted plant practices, *may* be cause for disciplinary action up to and including termination of your employment.

 \*   \*   \*   \*   \*   \*

The above *guidelines* add up to common sense behavior which is expected of all of us, both at work and elsewhere. They are subject to change as may become necessary; however, we shall strive to keep this list of standards at a minimum."

(Emphasis added). While use of one word rather than another in the handbook is, of course, not in itself dispositive, here the repeated use of non-mandatory language evinces a clear intent not to create a binding agreement. The permissive wording of the "guidelines" set forth in the Central States employment manual stands in stark contrast to the mandatory *requirements* imposed upon the company in *Ferraro*.

The fact that the "Standards We Go By" section of the Central States handbook repeatedly refers to the standards listed in items 1 through 10 merely as "guidelines," coupled with the lack of "a hierarchy of rules the infraction of which could lead to discharge, ... [and/or a provision] that a discharge would only be for 'just cause,'" 124 Wis.2d at 165, 368 N.W.2d 666, clearly distinguishes this case from *Ferraro*. Notably absent from the Central States manual is a promise that the parties' relationship could be terminated for cause only. In contrast to the *Ferraro* handbook, the language of the instant handbook clearly delineates the parties' intent to be bound to

a contract "at will." Following the Wisconsin Supreme Court's reasoning in *Ferraro*, we are convinced that the handbook's "guidelines" provide no support for a finding that the parties intended to bind themselves to anything other than an at-will contract. We agree with the district court's conclusion that "the language of the [Central States] manual does nothing to support [the plaintiff's] contention that his employment was a contractual relationship that could be terminated only for cause." Accordingly, Mursch's argument that the Central States employment handbook altered his at-will employment relationship with the company is without merit.

### III.

■ Mursch also maintains that the company agreed to alter his employment at-will status when Central States' Vice–President of Sales John Howington made this statement to Mursch during Mursch's first week on the job:

"[H]e [John Howington] was again telling me about how great it was to work for Central States Can and that they had no mandatory retirement and so long as you do your job you can be here until you're a hundred."

We agree with the trial court's ruling that this statement was insufficient as a matter of law to create a contract guaranteeing Mursch's employment. The district court premised its ruling on two separate findings: (1) the plaintiff had only identified John Howington as an employee of the defendant in its summary judgment material and thus the court could not assume that Howington "was in a position to bind the company to a contractual relationship with plaintiff"; and (2) the plaintiff failed to demonstrate that he understood the statement as a promise and responded with a promise of his own. The court stated:

"[The plaintiff] avers that one John Hovington [sic] told him during his first week of employment with defendant that 'so long as you do your job you can be here until you're a hundred.' Neither party has identified John Hovington [sic]. I can assume that he was an employee of

defendant, but I have no basis on which to assume, let alone find, that he was in a position to bind the company to a contractual relationship with plaintiff. Even if he was, his statement does not become a contract in the absence of any showing by plaintiff that he understood it as a promise and responded with a promise of his own, either express or implied. Plaintiff has come forward with no evidence to show either of those elements of a contract."

Further, we also agree with the district court that even assuming that Howington had the authority to bind Central States to a promise of lifetime employment,[4] Howington's statement cannot reasonably be construed as amounting to such a promise.

A leading New York case, *Brown v. Safeway Stores, Inc.*, 190 F.Supp. 295 (E.D.N.Y.1960) supports our approval of the district court's conclusion that Howington's statement cannot reasonably be construed as amounting to a promise of guaranteed employment. In *Brown*, the president of Safeway stated at a meeting of Safeway district managers (attended by the plaintiff) that "there would always be a job for each one of us." And at a later meeting, Safeway's Manager of Retail Operations stated that "we [the District Managers] would have jobs as long as we wanted them 'as long as we lived ...'." 190 F.Supp. at 297 n. 1. The court, noting that "[c]ontracts of life employment or permanent employment ... are extraordinary and unusual," found that the plaintiff's "employment contract was indefinite as to term and terminable at the will of either party." *Id.* at 299. Quoting from Williston on Contracts, 3d Ed. § 39 at 117, the court stated:

" 'In contracts of service when no time of employment is fixed by the express terms of the contract, the apparent intention of the parties must be sought as a question of fact, provided any circumstances can be shown which tend to prove that the parties were justified in assuming as against one another a definite intention in regard to the matter.

The rule ... is generally ... that a hiring indefinite as to time is terminable at the will of either party and creates no executory obligations. This has been held true even in regard to offers and agreements of service which specify that the employee shall receive a fixed sum for each day, week, month or year of service.' "

*Id.* We agree with the *Brown* court that given the extraordinary and unusual nature of true lifetime contracts, "[t]he intention to make an offer of life employment or any unusual offer of employment ... must be clear and unequivocal. A casual remark made at a meeting, a phrase plucked out of context, is too fragile a base on which to rest such a heavy obligation inherent in such a contract." *Id.* at 299–300. *Compare Ohanian v. Avis Rent A Car System, Inc.*, 779 F.2d 101, 109 (2d Cir.1985) (conversations conducted in an atmosphere of critical one-on-one negotiation regarding the terms of future employment may give rise to a contract of lifetime employment); *Toussaint v. Blue Cross & Blue Shield*, 408 Mich. 579, 292 N.W.2d 880 (1980) (employee may only be discharged for "cause" when a prospective employee inquires about job security *during a job interview* and the employer agrees that the employee shall be employed "as long as he does the job."); *Weiner v. McGraw-Hill, Inc.*, 57 N.Y.2d 458, 457 N.Y.S.2d 193, 443 N.E.2d 441 (1982) (same).

While *Brown* is factually dissimilar from the case at hand in that *Brown* dealt with employer representations made to the workforce in general, whereas Howington's statement was made to Mursch in a one-on-one conversation, it is nevertheless legally indistinguishable. Like the employer's remarks in *Brown*, it is undisputed that Howington's statement to Mursch was made in the context of casual conversation and merely amounted to encouragement and optimism. As such, the parties' con-

---

**4.** The defendant properly pointed out that Mursch's testimony that John Howington was Central States' Vice-President of Sales was not made part of the record until the filing of Mursch's motion for reconsideration, filed *after* the trial court had decided the summary judgment motion.

versation should not be twisted and contrived into an expression of intent to create a binding contract of lifetime employment. Because the parties failed to manifest a clear intent to agree to a contract of lifetime employment, one of the basic elements of a contract—mutuality of assent—is lacking. In light of the informal, casual, and off-the-cuff nature of Howington's remark, we are convinced that no reasonable employee would or should expect that guaranteed employment would be the result of such a conversation. As one commentator has noted, "[e]mployers and employees, like everyone else, sometimes speak in hyperbole to express their feelings of loyalty and friendship but without intent to invoke the heavy machinery of the law to enforce the literal meaning of these words." Holloway & Leech, Employment Termination: Rights and Remedies at 81–82. Like the employer's casual statements in *Brown*, we believe it is inconceivable that any reasonable jury would find that Howington's offhand remark in an informal conversation with Mursch was intended to bind the contracting parties to a contract of life employment.

From our research of Wisconsin case law, we also have reason to believe that the state's supreme court would in all probability agree with our application of the standards set forth in *Brown* to this case. In *Forrer v. Sears, Roebuck & Co.*, 36 Wis.2d 388, 153 N.W.2d 587 (1967), the Supreme Court set forth legal principles governing purported promises of lifetime employment that—although not precisely similar to those articulated in *Brown*—fit squarely within *Brown*'s holding. In the *Forrer* case, the plaintiff alleged that his employer guaranteed him "permanent employment" with Sears as Manager of the Hardware Division of Sears' Madison store. Similar to what the court said in *Brown*, the Wisconsin Supreme Court observed that there is a "strong presumption in favor of a contract terminable at will unless the terms of the contract or other circumstances clearly manifest the parties' intent to bind each other." 36 Wis.2d at 393, 153 N.W.2d 587. In light of this presumption, the court held that "a permanent employment con-

tract is terminable at will unless there is additional consideration in the form of economic or financial benefit to the employer." In so holding, the court explained:

> "*Generally speaking, a contract for permanent employment,* for life employment, or for other terms purporting permanent employment, where the employee furnishes no consideration additional to the services incident to the employment, *amounts to an indefinite general hiring terminable at the will of either party,* and a discharge without cause does not constitute a breach of such contract justifying recovery of damages.... The same is true where the contract of hiring specifies no term of duration but fixes compensation at a certain amount per day, week or month.... Although not absolute, *the above stated rule appears to be in the nature of a strong presumption in favor of a contract terminable at will unless the terms of the contract or other circumstances clearly manifest the parties' intent to bind each other.* The presumption is grounded on a policy that it would otherwise be unreasonable for a man to bind himself permanently to a position, thus eliminating the possibility of later improving that position. Moreover, a contract of permanent employment is by its very nature indefinite, and thus any effort to interpret the duration of the contract and assess the amount of damages becomes difficult. Wisconsin has aligned itself with the overwhelming majority of jurisdictions that have adopted the above stated principles."

(Citations omitted) (emphasis added). Under the *Forrer* and *Brown* analyses, Howington's casual, off-hand remark to Mursch that "so long as you do your job you can be here until you're a hundred," falls far short of "clearly manifest[ing] the parties' intent to bind each other," and thus fails as a matter of law to overcome the presumption recognized under Wisconsin law in favor of employment at will status.

We hold that the plaintiff has failed to establish either: (1) that the guidelines contained in Central States' employment man-

ual manifested an intent to abrogate the parties' at-will employment relationship; or (2) that Howington's oral statement to Mursch can reasonably be interpreted to alter Mursch's employee at-will status. Accordingly, the decision of the district court is

AFFIRMED.