Robert T. FITTSHUR, Plaintiff–
Appellant,

v.

VILLAGE OF MENOMONEE FALLS, Sentry Insurance Company, a mutual company and Scottsdale Insurance Company, Defendants–Appellees.

No. 93–2896.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 23, 1994.

Decided Aug. 10, 1994.

clusion in a petition for certiorari to review the judgment of this court.

Daniel R. Dineen, Milwaukee, WI (argued), for Robert T. Fittshur.

Philip C. Reid, Cook & Franke, Milwaukee, WI (argued), for Village of Menomonee Falls and Scottsdale Ins. Co.

Barbara A. O'Brien, Borgelt, Powell, Peterson & Frauen, Milwaukee, WI, for Sentry Ins. Co.

Before POSNER, Chief Judge, and COFFEY and KANNE, Circuit Judges.

COFFEY, Circuit Judge.

Robert Fittshur brought an action under 42 U.S.C. § 1983, against the Village of Menomonee Falls, Wisconsin, and its insurers (collectively, "the Village"). Fittshur stated a variety of claims, among them that the Village, in terminating his employment as an assistant assessor, deprived him of a property interest in his job and a liberty interest in his opportunity to pursue new employment, without due process of law. Fittshur appeals the grant of summary judgment to the Village. We affirm.

## BACKGROUND

The Village hired Fittshur as an assessment technician in the assessor's office in April 1969. After a 120–day probationary period, Ed Vogt, who at that time was the Village assessor, informed Fittshur that he would be retained as a regular employee. In February 1985, Fittshur was promoted to the position of assistant assessor.

In early 1989, Fittshur purchased, and planned to develop, two acres of wetland real estate located on Harding Drive in Menomonee Falls. Soon afterwards, the local newspaper, *The Menomonee Falls News,* reported that residents living near the wetland objected to its development. Some residents were reported as lamenting that, had they known that the land was for sale, they might have purchased it themselves; they accused Fittshur of having benefitted from "inside knowledge" he gained as an assistant assessor. According to the article, Fittshur claimed to have read about the availability of the land in a newspaper report and to have discussed the purchase of it with his "boss." In fact,

Fittshur had not obtained prior approval for the transaction.

Fittshur's supervisors, however, did have a general knowledge of his real estate dealings. Fittshur had discussed some of these dealings with Russell Weber, the Village assessor at the time of Fittshur's dismissal, who often said, "[W]hat you do on your own time is your own business." Richard Farrenkopf, the village manager at the time of Fittshur's dismissal, was also familiar with Fittshur's previous real estate dealings and had never raised objections to them. In 1979, when Farrenkopf was assistant village manager, a newspaper article was published suggesting that Fittshur's employment by the Village was in conflict with his private efforts to obtain a zoning variance from the Village Planning Commission. Fittshur was not disciplined for that incident; on the contrary, then Village Manager Gottlieb informed Fittshur that he was "free to do what [he] wanted on [his] own time." Thereafter, Fittshur regularly appeared before the Village Planning Commission on private business. Farrenkopf had knowledge of these appearances once he became village manager, if not sooner.

Whatever their feelings about Fittshur's previous dealings, Weber and Farrenkopf did not respond favorably to the newspaper report concerning Fittshur's purchase of the Harding Drive property. On April 28, 1989, Weber sent Fittshur a terse memorandum directing him to refrain immediately from purchasing real estate for resale in the Village. On May 1, Fittshur met with Weber and Farrenkopf and explained that pending transactions prevented him from complying with Weber's instruction. Specifically, Fittshur said that he had already entered into a contract to purchase land from the estate of Julia Kletsch and had recently put several of his own properties up for sale. On May 4, Farrenkopf issued a memorandum to Fittshur, stating:

> On at least two occasions in the past ..., I have discussed with you conflict of interest, impropriety, and the appearance of impropriety as a municipal employee. We had discussed in detail your real estate

activities, and I cautioned you on actions that reflected adversely on the Village....

The *Falls News* article of last week concerning your proposed development of the [Harding Drive property] is an illustration of the "appearance" of impropriety in that it *appears* you are using "insider" information in your real estate activities. While my investigation confirms this is NOT the case, the public perception remains that "something is wrong."

\* \* \* \* \* \*

I am ordering that you refrain from being involved directly or indirectly in *any* real estate transaction or development within the Village of Menomonee Falls except for the sale or purchase of a personal residence.

Farrenkopf's memorandum also directed Fittshur to submit a list of all his past and present real estate transactions in Menomonee Falls.

In a May 8, 1989, memorandum to Weber and Farrenkopf, Fittshur defended his actions, noting that he had not violated a formal code of ethics (none was in place) and that no other employees of the Village were subject to restrictions on their outside business activities. Invoking his right to privacy, Fittshur refused to disclose any information to Weber and Farrenkopf concerning his real estate transactions. Furthermore, Fittshur indicated that he would continue to engage in real estate transactions, since any prohibition on such activity would violate his right to contract. Fittshur eventually completed his purchase of the Kletsch property as well as the sale of several of his properties.

After receiving Fittshur's May 8 memorandum, Farrenkopf hired Alpha Omega Security (Alpha) to conduct an investigation for the Village into Fittshur's real estate dealings. During the course of the investigation, which extended through the summer of 1989, Alpha contacted a number of people who had been involved in real estate transactions with Fittshur. Several of them were told by Alpha that the Village was investigating Fittshur because of evidence that he had taken advantage of the elderly in his transactions, had made improper use of assessed valua-

tions and other Village records, had forged signatures on land-sale contracts, and had committed other unspecified "improprieties" in his real estate dealings.

In November 1989, Alpha completed its investigation and apprised Farrenkopf of its findings. The record does not disclose Alpha's findings. It does indicate, however, that Alpha did not find that Fittshur had used "inside information" either in his purchases of the Schwartz and Harding Drive properties or in any subsequent real estate transactions. On November 20, Farrenkopf met with Fittshur, questioned him about his use of Village information in his private real estate transactions, and gave him the option of resigning or being discharged. Fittshur refused to resign and was discharged the following day. Farrenkopf gave no explanation for his action. Nor had Fittshur been warned that such action was imminent; on the contrary, Weber had recently given Fittshur a complimentary performance evaluation and had discussed the possibility of promoting him to the position of deputy assessor.

Thomas Schmidt, an assistant assessor who worked with Fittshur, understood from observing Fittshur at work and from conversations with Weber that Fittshur was fired for exploiting in private real estate transactions information he had gained as an assistant assessor for the Village. The reasons for Fittshur's termination quickly became "general knowledge." John Ugrotzi, assessor for the City of Oak Creek, Wisconsin, said that Weber told him at a professional gathering in 1991 that Fittshur had been terminated for "buying real estate on city time."

In January 1991, Fittshur filed this suit against the Village under 42 U.S.C. § 1983. He alleged that the Village's termination of his employment without prior notification and a disciplinary hearing deprived him of a property right in his employment without due process of law. Fittshur also alleged that the Village's dissemination of false information concerning the reason for his discharge deprived him of a liberty interest in pursuing his occupation. In granting summary judgment to the Village, the district

court found that Fittshur did not have a constitutionally protected property interest in his job and that, although Fittshur had a constitutionally protected liberty interest in pursuing his occupation, the Village did not deprive Fittshur of that interest. This appeal followed.

## DISCUSSION

We review the grant of summary judgment de novo. *Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1388 (7th Cir.1993). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). We view the record and all justifiable inferences drawn from it in the light most favorable to the party against whom judgment was entered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986).

■ Fittshur asserts a constitutional right to due process of law. As the Supreme Court stated in *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 541, 105 S.Ct. 1487, 1492–93, 84 L.Ed.2d 494 (1985), a court confronting a procedural due process question must make two separate inquiries. First, the court must determine whether the plaintiff possesses a protected life, liberty, or property interest as a matter of substantive law. If the first inquiry yields an affirmative response, the court must determine what process is due before the plaintiff can be deprived of the protected interest.

### A. Property Interest

■ Fittshur contends that he possessed a property interest in his employment of which the Village deprived him without due process of law. The existence of a substantive property interest in public employment is ordinarily a question of state law. *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). The events giving rise to this suit occurred in Wisconsin, so the law of that state governs. When called upon to decide the question whether an employee possesses a property interest in employment, Wisconsin's courts have generally resolved the matter by providing a simple yes or no answer based on whether the employment is at-will or for cause. *See Listenbee v. City of Milwaukee*, 976 F.2d 348, 351 (7th Cir.1992). This is exemplified by *Vorwald v. School District of River Falls*, 167 Wis.2d 549, 482 N.W.2d 93, cert. denied, —— U.S. ——, 113 S.Ct. 378, 121 L.Ed.2d 289 (1992), where the Wisconsin Supreme Court held that because a school custodian was an at-will employee, he had no property interest in his continued employment. The *Vorwald* court stated that "[u]nder Wisconsin law, employment at will is the rule. Absent civil service regulations or laws, or a contract or collective bargaining agreement, a municipal employee is an employee at will and has no property interest in employment." *Id.* 482 N.W.2d at 96; *see also Listenbee*, 976 F.2d at 351.

■ Fittshur concedes that the terms of his employment were not governed by a civil service law, a written contract, or a collective bargaining agreement. He submits that he was granted a property interest in his employment by a village ordinance, provisions of the Village's employee handbook, and statements of his superiors suggesting that his employment with the Village was secure.

The ordinance relied upon by Fittshur provides:

> The Village Manager shall have the authority to appoint ... all Village employees.... He shall have the authority, when necessary for the good of the Village service, to suspend or discharge employees of the Village....

Village of Menomonee Falls Ordinance § 1.04(2)(b). In *Hale v. Stoughton Hospital Association, Inc.*, 126 Wis.2d 267, 376 N.W.2d 89, 94 (App.1985), the Wisconsin Court of Appeals held that a bylaw in the defendant hospital's charter empowering the board of directors of the hospital to remove an officer "whenever in [the board's] judgment the best interests of the hospital would be served thereby," created "more than a

mere 'at-will' employment." Consequently, the court concluded, unlike an at-will employer, the board could not discharge the plaintiff officer for any or no cause. Fittshur argues that, just as the bylaw in *Hale* created more than an at-will employment relationship between officers of the hospital and the hospital, Village Ordinance § 1.04(2)(b), gave rise to something more than an at-will employment relationship between him and the Village. This employment relationship, the argument continues, translates to a property interest in employment with the Village that is protected by the United States Constitution.

This argument has facial appeal. We have said that property interests are created by state law and that, under Wisconsin law, an employment relationship that is more than at-will confers a property interest in employment. *Hale* has statewide precedential effect. *See* Wis.Stat. § 752.41(2) ("Officially published opinions of the Court of Appeals have statewide precedential effect.") And the language of the bylaw held in *Hale* to create more than at-will employment ("whenever in [the board's] judgment the best interests of the hospital would be served)," is substantially similar to the phrase, "for the good of the Village service," in Village Ordinance § 1.04(2)(b).

Nevertheless, *Hale* was decided nearly nine years ago, before the United States Supreme Court's decision in *Kentucky Department of Corrections v. Thompson*, 490 U.S. 454, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989). Whatever precedential effect *Hale* has in Wisconsin's state courts with respect to questions of state law, the Supreme Court's decision in *Thompson* forecloses the possibility that language of the type used in the bylaw at issue in *Hale* creates the type of property interest that is protected by the Federal Constitution. *Thompson* holds that the existence of the type of property interest that is protected by the Federal Constitution depends upon " 'explicitly mandatory language,' in connection with the establishment of 'specified substantive predicates' to limit discretion." *Id.* at 460–63, 109 S.Ct. at 1908–10. The rule that a hospital board may dismiss an officer "whenever in [the board's] judgment the best interests of the hospital

would be served" does not create a property interest because it places but a nominal limitation on the board's discretion to discharge an officer.

Similarly, the rule here that a village manager may discharge an employee of the Village "when necessary for the good of the Village service" does not restrict the village manager's discretion in any meaningful way. "Explicitly mandatory language" which would limit the village manager's authority to discharge Fittshur, or any other employee of the Village, is lacking. Under the ordinance, the village manager defines, without prescribed guidelines, the permissible scope of his own discretion. Almost any discharge of a Village employee can be defended as "necessary for the good of the Village service."

The all-encompassing meaning of the phrase "necessary for the good of the Village service" renders any interest in employment with the Village at best uncertain. Thus, other Courts of Appeals, before and after the Supreme Court's decision in *Thompson*, have held that the phrase "for the good of the service" (or a close variation thereof) does not give rise to a property interest. *See Driggins v. Oklahoma*, 954 F.2d 1511, 1514 (10th Cir.) (city charter stating that "removals and demotions shall be made solely for the good of the service" did not, under Oklahoma law, create property interest in employment with city), *cert. denied*, —— U.S. ——, 113 S.Ct. 129, 121 L.Ed.2d 84 (1992); *Bunting v. City of Columbia*, 639 F.2d 1090, 1093–94 (4th Cir.1981) (South Carolina law empowering city to dismiss employees "for the good of the municipality" did not create property interest in employment with city); *Owen v. City of Independence*, 560 F.2d 925, 937–38 (8th Cir.) (city charter allowing dismissal of employee "when deemed necessary for the good of the service" did not, under Missouri law, create property interest in employment with city), *vacated on other grounds*, 438 U.S. 902, 98 S.Ct. 3118, 57 L.Ed.2d 1145 (1978).

We find these decisions persuasive. So far as it appears, Wisconsin's courts have not, since the Supreme Court's decision in *Thompson*, determined whether language in

an ordinance that grants an official the authority to discharge employees "for the good of the Village service" (or for a substantially similar reason) creates a property interest in employment. Absent guidance from Wisconsin's state courts, we independently resolve the issue and join the Fourth, Eighth, and Tenth Circuits in holding that such language does not create a property interest.

▮▮▮ In his 20 years as an employee of the Village, Fittshur never entered into a written employment contract with the Village. Every few years, however, he was provided with an employee handbook. Fittshur contends that an employment contract implied from the handbook changed his employment from at-will to for-cause. An employee handbook may alter at-will employment only if it contains express conditions from which it reasonably could be inferred that the parties intended to enter into anything more than an at-will employment relationship. *Ferraro v. Koelsch,* 124 Wis.2d 154, 368 N.W.2d 666, 672 (1985). The 1975 and 1979 versions of the handbook provide:

All new employees are subject to a 120–day probationary period. Successful completion of this period entitles you to regular employee status, and you will begin receiving the benefits of regular employees in your department. (A regular employee is a full-time employee who has successfully completed his probationary period.)

If, in the opinion of the Department Head and the Village Manager, you have not successfully performed the duties required of your position, you will be dismissed.

Fittshur claims that these provisions led him to believe that successful completion of his probationary period entitled him to regular employee status and that, once he became a regular employee, he could be discharged only for cause. In *Ferraro,* a probationary employee/regular employee dichotomy was held to provide credible evidence of the parties' intent to create something other than at-will employment. *Id.* 368 N.W.2d at 673. This was so because the handbook provided for different processes for discharging probationary and regular employees; set out a hierarchy of rules; and promised that the

employee would be entitled to different treatment depending on the misconduct, with discharge resulting only for "just cause." *Id.* 368 N.W.2d at 672.

By contrast, the 1975 and 1979 handbooks in this case, while drawing a distinction between probationary and regular employees, do not describe the significance of the distinction. A regular employee is defined simply as an employee who has completed the 120–day probationary period. The difference might have nothing to do with tenure. Notably absent from the handbooks is language prescribing that the employment of a regular employee can be terminated only for just cause.

The handbooks in this case more closely resemble the employee handbook at issue in *Bantz v. Montgomery Estates, Inc.,* 163 Wis.2d 973, 473 N.W.2d 506 (App.1991), which was held not to create a for cause employment relationship. The handbook in that case, like the one here, differentiated probationary from non-probationary employees. The *Bantz* handbook also expressly disclaimed the existence of an employment contract and reserved the employer's right to amend the handbook at any time without notice. Similarly, the 1975 and 1979 versions of the handbook here are prefaced with the statement, "As time goes on and as the Village grows, the policies set forth in this booklet may change." The 1987 version of the handbook, which was in effect when Fittshur was discharged, provides:

The contents of the Employee Handbook are presented as a matter of information only. Although the Village believes wholeheartedly in the policies and procedures described herein, they are not conditions of employment. The Village reserves the right to modify or change any of the policies or procedures in the Handbook at any time. The language used in the Handbook is not intended to create, nor should it be construed to constitute, a contract of employment.

In light of this language expressly stating that nothing in the handbook created a contract of employment between the Village and its employees and that the Village could uni-

laterally change the policies in the handbook at any time, Fittshur's argument that the distinction in the handbook between probationary and regular employees creates something more than at-will employment must fail.

After Fittshur had successfully completed his 120–day probationary period, and during each of Fittshur's annual performance evaluations, village assessor Ed Vogt told Fittshur that, although Fittshur's pay was not high, he at least had "the security of working for a municipality where they don't have layoffs and fire people for any reason." In 1981 Vogt retired and was replaced by Russell Weber. Weber told Fittshur on more than one occasion that Fittshur "would have job security and wouldn't ... be terminated or fired for ... any reason other than just cause." Fittshur was also told on numerous occasions by Frederick Gottlieb, the village manager at the time Fittshur was hired, that "the nice thing about being a Village employee is that you have job security." The Supreme Court has stated that a "person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit." *Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972). Fittshur contends that Vogt's, Weber's, and Gottlieb's statements evidence an explicit understanding with the Village that his employment was something more than at-will.

An official's representations cannot form the basis of a "mutually explicit understanding" unless that official has the authority to make the representations. *Wolf v. City of Fitchburg,* 870 F.2d 1327, 1334 (7th Cir. 1989); *Common v. Williams,* 859 F.2d 467, 471–72 (7th Cir.1988). Village Ordinance § 1.04(2)(b) grants the village manager "the authority to appoint ... all Village employees." Thus, of the three officials who told Fittshur about job security, only Gottlieb had the authority to alter Fittshur's employment relationship with the Village.

But Fittshur maintains that this does not matter because Vogt's and Weber's representations, although they could not bind the Village, tend to support the proposition that his employment was something more than at-will. Fittshur submits that the representations explain what Gottlieb meant by "job security." Nevertheless, because they were *ultra vires,* the representations of Vogt and Weber play no part in defining the nature of Fittshur's employment relationship with the Village. *Cf. Common,* 859 F.2d at 472 (employer not bound by *ultra vires* interpretation of length of employee's probationary period); *Hadley v. County of DuPage,* 715 F.2d 1238, 1242–43 (7th Cir.1983) (employment relationship between county and its employees not altered by unofficial statements of county board members), *cert. denied,* 465 U.S. 1006, 104 S.Ct. 1000, 79 L.Ed.2d 232 (1984). The representations, made as they were by officials without the authority to alter the terms of Fittshur's employment, might well have been based on a misinterpretation of what Gottlieb meant by "job security."

Gottlieb's observation that "the nice thing about being a Village employee is that you have job security" resembles the one we considered in *Mursch v. Van Dorn Co.,* 851 F.2d 990 (7th Cir.1988). The plaintiff in that case claimed that his employer's remark during the first week of the plaintiff's employment that, "so long as you do your job you can be here until you're a hundred," bound his employer to a contract of lifetime employment. *Id.* at 996. We held that the employer's remark could not be reasonably construed as a promise of lifetime employment. *Id.* at 996–97. Such a promise, we reasoned, must be clear and unequivocal. The employer's remark was neither clear nor unequivocal because it was made during a casual conversation with the employee. *Id.* at 997–98. Here, the context of Gottlieb's observation about job security was not so informal, as it was made during Fittshur's annual salary evaluation. Nevertheless, Gottlieb's observation does not amount to a clear and unequivocal promise of employment terminable only for just cause because it is entirely unclear what Gottlieb meant by "job security." It is conceivable that "job security" meant that Fittshur could not be fired without just cause. It is equally conceivable,

however, that "job security" meant that, as a practical matter, Fittshur *probably* would not be fired, laid off, or transferred.

Fittshur argues that the longevity of his employment with the Village; his promotion to assistant assessor; his supervisory capacity; and the fact that he was the only "regular" employee to be discharged by the Village in over 20 years demonstrate that by "job security," Gottlieb meant "employment terminable only for just cause." We disagree. That Fittshur was the only regular employee to be discharged by the Village in quite some time more directly supports the proposition that by "job security" Gottlieb meant Fittshur *probably* would not be discharged. And the fact that Fittshur was a supervisor is irrelevant to the question whether he had a property interest in his employment since there is no suggestion that a supervisor's interest in his job is greater than that of a low-level employee. Finally, there are numerous possible reasons for the Village's decision to retain Fittshur for 20 years and to promote him to the position of assistant assessor other than because it could not discharge him at-will. The Village might have done these things, for example, because it believed that Fittshur was a skilled employee.

Thus, we conclude, as did the district court, that neither the ordinance, nor the employee handbooks, nor the statements of Village officials, nor anything else, conferred upon Fittshur a property interest in his employment with the Village.

B. Liberty Interest

■ Even though Fittshur had no property interest in his employment, he did have a liberty interest in pursuing his occupation. *See Schware v. Board of Bar Examiners,* 353 U.S. 232, 238–39, 77 S.Ct. 752, 756, 1 L.Ed.2d 796 (1957). The Village therefore was required to afford Fittshur due process if, in the process of discharging him, it publicly charged him with immorality, dishonesty, or the like, or otherwise stigmatized him in a way that foreclosed future employment opportunities. *See Paul v. Davis,* 424 U.S. 693, 701, 96 S.Ct. 1155, 1160–61, 47 L.Ed.2d 405 (1976). Fittshur contends that he lost em-

ployment opportunities because Weber told Schmidt and Ugrotzi that he had been fired for buying real estate on Village time; because the Village told the same story to prospective employers; and because Alpha, acting for the Village, told various people that he had committed improprieties in his real estate transactions.

■ As noted by the district court, Weber's statement to Ugrotzi that Fittshur had been terminated for buying real estate during working hours was made after this suit was commenced and therefore cannot be used to support Fittshur's claim. *See Shlay v. Montgomery,* 802 F.2d 918, 924 (7th Cir. 1986). And, as further noted by the district court, Weber's statements to Schmidt cannot support Fittshur's claim because there is no indication that the statements went public. *Ratliff v. City of Milwaukee,* 795 F.2d 612, 627 (7th Cir.1986). So far as it appears, the statements went no further than the Village assessor's office. The subsequent public circulation of rumors concerning the reasons for Fittshur's termination does not suggest that the Village government was the source of the rumors. We are not persuaded by Fittshur's contention that, because only Weber, Farrenkopf, and Jo Ellen Mulder, Farrenkopf's assistant, participated in the meeting of November 20, 1989, during which he was discharged, one of these three officials must have leaked false information as to why he was discharged. As noted above, seven months before he was discharged, Fittshur was accused in an article in the *Menomonee Falls News* of having used the "inside knowledge" he gained as an assistant assessor to his advantage in his purchase of property on Harding Drive in Menomonee Falls. This accusation was based not on information received from Village employees, but on claims by private citizens of Menomonee Falls that they had not known the Harding Drive property was for sale. It is much more likely that the public rumors as to why Fittshur was ultimately discharged derived from the newspaper article than from Village officials.

■ Fittshur's contention that he lost employment opportunities because the Village represented to prospective employers that he had been discharged for conducting

personal real estate transactions on Village time can fare no better. It is undisputed that Farrenkopf instructed the people he consulted in making his decision not to disclose the reasons for the termination to prospective employers. Prospective employers were to be informed only that Fittshur had worked for the Village and about the positions he had held. Fittshur did not produce evidence that Farrenkopf's instructions were not followed. Contrary to Fittshur's protestations, the fact that he applied for 89 jobs without receiving an offer of employment does not support an inference that the Village made defamatory statements to prospective employers that cost him employment opportunities. There is no evidence that any of these employers refused to hire Fittshur because the Village misrepresented the reasons for Fitthsur's dismissal.

Whether Alpha's statements to its interviewees create a triable issue is a more difficult question. It cannot be doubted that the statements, which were apparently unfounded, may have damaged Fittshur's reputation in certain professional circles. The question here, however, is whether the Village may be held responsible for Alpha's defamatory statements.

Alpha was the Village's agent. A municipality cannot be made liable for the actions of its agents by application of the doctrine of *respondeat superior*. *Monell v. New York City Dep't of Social Svcs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). Hence, for the Village to be held responsible for Alpha's defamatory statements, it must be established that a Village official with policy-making authority sanctioned or ordered the comments. *Id.* at 692–94, 98 S.Ct. at 2036–38.

The record does not support Fittshur's contention that the Village officially sanctioned Alpha's defamatory comments. Farrenkopf, who had the authority to set Village policy, directed Alpha to inquire into whether Fittshur had engaged in improprieties in connection with his Village employment but did not advise or instruct Alpha on how to explain the reason for the investigation to the people it interviewed. Farrenkopf was not present during Alpha's interviews, nor did he hear tapes of them. Although Farrenkopf was informed periodically during the course of the investigation of Alpha's findings, he was never made aware of the manner in which Alpha was representing Fittshur to the people it interviewed.

Fittshur, however, argues that Farrenkopf sanctioned Alpha's defamatory statements simply by hiring Alpha to investigate his real estate dealings. In so arguing, Fittshur analogizes this case to *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). There the Supreme Court found municipal liability where an assistant county prosecutor instructed deputy sheriffs to "go in and get" witnesses who had failed to appear before a grand jury. In response to the prosecutor's command, the deputy sheriff's chopped down the door to a physician's clinic with an axe. *Id.* at 472–73, 106 S.Ct. at 1292–93. Here, Fittshur submits that Farrenkopf's hiring of Alpha to investigate his real estate dealings was functionally equivalent to the prosecutor's order to "go in and get" the witnesses and thus, as in *Pembaur*, the municipality should be liable for the consequences of the conduct of its agents. We disagree. In *Pembaur*, the prosecutor's affirmative order could reasonably be expected to result in the conduct for which the municipality was held liable. Before he affirmatively ordered the deputy sheriffs to "go in and get" the witnesses from the physician's clinic, the prosecutor knew that the physician had barricaded the door to the clinic and had refused voluntarily to allow them to enter. That the deputy sheriffs would chop down the door was a foreseeable consequence of the prosecutor's order. Here, by contrast, Farrenkopf did not affirmatively order Alpha to represent Fittshur in a negative light, nor were Alpha's defamatory statements about Fittshur a foreseeable consequence of Farrenkopf's instruction to investigate Fittshur's real estate dealings.

Finally, Fittshur maintains that the Village was on notice of Alpha's defamatory statements by virtue of a file given by Alpha to Weber in the summer of 1989. He asserts that included in this file were letters sent by Alpha to Harry and Dolores Hart in which it was claimed that Fittshur had forged their

signatures on the warranty deed for property that he had purchased from them. Nevertheless, Alpha mailed the letters to the Harts on September 15, 1989, some time after the summer of 1989 when Weber reviewed the file. Moreover, even if Weber had seen the letters, this would not mean that the Village sanctioned their content. For Weber, the Village assessor, clearly lacked authority to set Village policy.

Therefore, we are of the opinion that the Village did not deprive Fittshur of his liberty interest in pursuing his occupation.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.